# Illinois Official Reports

## Supreme Court

***People v. Belknap*, 2014 IL 117094**

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. DANIEL R. BELKNAP, Appellee. |
| Docket No. | 117094 |
| Filed | December 18, 2014 |
| Held (*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Venirepersons must be asked if they understand certain principles, and the absence of this inquiry is error, although not *per se* reversible error; and the appellate court should not have reversed and remanded for a new trial in a murder case in which this defect was forfeited as not properly preserved, but the evidence was sufficient to convict, where the supreme court concluded that the evidence, viewed in a commonsense manner and in the context of the totality of the circumstances, was not closely balanced as required for the plain error review which the appellate court employed. |
| Decision Under Review | Appeal from the Appellate Court for the Third District; heard in that court on appeal from the Circuit Court of McDonough County, the Hon. Greg McClintock, Judge, presiding. |
| Judgment | Appellate court judgment reversed. |

| Counsel on Appeal | Lisa Madigan, Attorney General, of Springfield and James Hoyle, State's Attorney, of Macomb (Carolyn E. Shapiro, Solicitor General, and Michael M. Glick and John R. Schleppenbach, Assistant Attorneys General, of Chicago, and Patrick Delfino, Terry A. Mertel and Gary F. Gnidovec, of the Office of the State's Attorneys Appellate Prosecutor, of Ottawa, of counsel), for the People. |
| | |
| | Michael J. Pelletier, State Appellate Defender, Peter A. Carusona, Deputy Defender, and Andrew J. Boyd, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Ottawa, for appellee. |
| | |
| Justices | CHIEF JUSTICE GARMAN delivered the judgment of the court, with opinion. |
| | Justices Thomas, Kilbride, Karmeier, and Theis concurred in the judgment and opinion. |
| | Justice Burke specially concurred, with opinion, joined by Justice Freeman. |

## OPINION

¶ 1 Following a jury trial in the circuit court of McDonough County, defendant, Daniel R. Belknap, was convicted of first degree murder in the death of five-year-old Silven Yocum. The trial court sentenced him to 24 years in prison. The appellate court, with one justice dissenting, reversed defendant's conviction and remanded for a new trial. 2013 IL App (3d) 110833. This court granted the State's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. July 1, 2013).

¶ 2                                          BACKGROUND

¶ 3 This was defendant's second jury trial on the murder charge. His first conviction was reversed by the appellate court and remanded for a new trial due to the trial court's failure to comply with Supreme Court Rule 431(b) (Ill. S. Ct. R. 431(b) (eff. May 1, 2007)) during jury selection when it did not ask the potential jurors whether they understood and accepted the four principles contained in that rule. The appellate court reviewed the error under the plain error doctrine and found the error reversible because the evidence was closely balanced. *People v. Belknap*, 396 Ill. App. 3d 183 (2009).

¶ 4 Evidence at defendant's second trial showed that on September 10, 2006, Silven was transported to McDonough District Hospital (MDH) by ambulance after her mother, Erin Yocum, called 911 and reported that Silven was having seizures. She was later airlifted to St. Francis Hospital in Peoria, where she received treatment for swelling in her brain and underwent surgery to remove a blood clot from her brain. The treatments were unsuccessful and Silven remained in a coma until her death on September 16, 2006. Forensic pathologists

who testified at defendant's trial opined that Silven died from a closed-head injury due to multiple blunt force trauma, causing bleeding on her brain, and bruising and abrasions to her head. The injuries resulted from nonaccidental blows and could have been delivered by a human hand, fist, foot, or an object. The injuries were most likely sustained between 12 and 24 hours prior to the onset of Silven's seizures. One of the pathologists, Dr. Mitchell, stated that Silven sustained five distinct blows to the head. The trauma would not likely have been caused by falling off a trampoline or by falling down one time. The other pathologist, Dr. Blum, opined that Silven sustained three blows to her head. Loss of consciousness would take several hours to occur because it takes time for the brain to swell and begin to bleed. Symptoms would include loss of appetite, listlessness, sleepiness, seizure, and an inability to wake.

¶ 5     Defendant and Erin were romantically involved. Erin and Silven spent a lot of time at defendant's house and Silven was due to start kindergarten in August 2006. At some point shortly before Silven's death, she and Erin moved into defendant's house. Erin and defendant were methamphetamine (meth) users. Larry Leasman testified that he stopped by defendant's house in the early morning hours of September 9, 2006, and they smoked meth in the garage. While Leasman was there, Erin returned from a trip to Wal-Mart. He did not recall whether Erin also smoked meth with them, but Erin testified that she did not. She went into the house to go to bed. She awoke at about 6 a.m. and went to join defendant in the garage. Silven joined them sometime later. During the day, Erin noticed that Silven seemed sluggish and tired and was very clingy. She thought Silven might be getting sick. When defendant asked Silven to go into the house with him and help him make breakfast, Silven cried and said she did not want to go with defendant. After breakfast, defendant took Silven for a ride on his four-wheeler. Later that day, because Silven had no one to play with, Erin went to the home of her brother, Erik, and brought his six-year-old son, Brett, back to defendant's house to play with Silven. When Erin returned with Brett, Silven was still not feeling well. There was a trampoline in the yard. Silven would not jump on it with Brett, but instead sat in a chair and watched him. Erin testified that Silven did not complain of any headaches, she was not bleeding, and Erin did not notice anything unusual about her physical appearance.

¶ 6     Later that evening, Erik arrived to pick up Brett for a birthday party. Silven went with him to drop Brett off at the party. When Erik and Silven returned to defendant's house, Erik commented to Erin that Silven did not seem to have much of an appetite, which was unusual for her. Erik then left. Sometime later, Erik called Erin and said one of the tires on his truck fell off while he was on his way to pick up Brett from the party. Defendant stayed home with Silven while Erin went to pick up Erik. She was gone about 20 minutes and when she and Erik returned, Silven was in bed. The next morning, September 10, 2006, Erin got up to use the bathroom and noticed that Silven was snoring loudly. She did not go into the bedroom to check on Silven. Erin went into Silven's room around noon and discovered that Silven was seizing. She would not wake up. Erin called 911.

¶ 7     At MDH, a doctor told Erin that Silven had been tied at the ankles, sodomized, and that she had a punctured bowel and a broken sternum. None of this turned out to be true. As Silven was being airlifted to St. Francis, defendant and Erin got in the car to drive to the hospital. Partway there, defendant decided not to go. Erin got out of the car and went on to the hospital with her parents, who had been following in their own car. St. Francis personnel told Erin and her parents that defendant was not allowed to be there.

¶ 8        Erin testified that she had previously been involved with another man, Andy Yates, for several years. Yates and Silven had a very close relationship and when Erin started dating defendant, Silven had difficulty being away from Yates and being with defendant. However, according to Erin, defendant and Silven got along well. Defendant was very good to Silven and appeared to love her. He was not angry with her and never screamed at her or spanked her. Erin also testified that Silven did not like being uprooted from her former home and that she could sense that Silven was not fond of defendant.

¶ 9        Erin denied causing Silven's injuries. She did not know how Silven was injured and did not notice any injuries to her body. Erin testified that she had several interviews with the police and that she felt they were unfairly targeting defendant and trying to get her to implicate defendant in Silven's death. Defendant was being held in the Tazewell County jail on federal drug charges and Erin visited him many times while he was there. This was before he was charged with Silven's murder, which took place more than a year after Silven died. Erin wrote many letters to him and they had numerous phone conversations. She maintained her relationship with defendant because she loved him and did not believe he had caused Silven's death. When Erin complained to defendant that the sheriff wanted to interview her yet again and that she did not want to go, defendant advised her not to talk to the sheriff and to change her cell phone number.

¶ 10        Erik Yocum testified that the night he was at defendant's house, Silven did not want to stay there and she begged and cried to be allowed to go home with Erik. When he got to the house the next day after Erin had called 911, defendant was on the front porch brushing his teeth. Erin was in Silven's bedroom and appeared upset. Defendant appeared concerned, but not upset.

¶ 11        Two of the paramedics who responded to Erin's 911 call testified. Silven was having convulsions when they arrived. Her upper extremities were shaking uncontrollably, her eyes were open and fixed to the right, and there was nystagmus (uncontrolled shaking of the eyeballs). She did not respond to any stimuli. She also had dried blood around her nose and mouth. One of the paramedics, Aaron Wilson, testified that he did not see defendant in the room while he was there, but he acknowledged that defendant could have come in without Wilson seeing him. Wilson also testified that when he was kneeling over Silven, he saw defendant pacing in the kitchen, saying, "Oh, shit; oh damn; and goddamn." Another paramedic, Heather Connor, stayed with Silven at MDH until she was airlifted to St. Francis. Erin was upset and in a state of shock. She stayed with Silven in the trauma bay, rubbing her hand and stroking her head. Defendant was also there but he kept his back turned to Silven and did not approach her.

¶ 12        Michael Skelton, a friend of defendant's, testified that on the morning of Monday, September 11, 2006, he was working at his job for the City of Macomb when he saw defendant walking near the building in which the sheriff's office is located. When he stopped to talk, defendant said he needed to talk to "them about some shit." Defendant did not say who "them" was, but Skelton assumed he meant the sheriff's office. Defendant asked Skelton how to get into the building and Skelton drove defendant around to the front of the building and dropped him off. Skelton did not see whether defendant went inside.

¶ 13        Defendant's cousin, Matthew Hocker, testified that on the night of September 10, 2006, defendant came to his residence, crying and shaking. Defendant told Hocker what happened to Silven and said he was concerned about not being allowed to go to the hospital. Hocker

testified that defendant wondered aloud if he should be worried about the police contacting him. Defendant said something about a trampoline. Hocker had seen defendant around Silven and never noticed any problems.

¶ 14 Jill Kepple was a friend of defendant. She testified that defendant came to her house the evening of September 10, 2006. He was nervous and upset and was pacing. He asked Kepple if she thought someone would call the police regarding what happened to Silven. He told Kepple that he did not know what could have happened to Silven.

¶ 15 Two jailhouse informants testified for the State. Joseph Burgess shared a cell with defendant at the Tazewell County jail between April 2007 and July 2007. Burgess was facing multiple charges, including aggravated arson, residential burglary, arson, and burglary. He and defendant became friends. At the time of defendant's trial, Burgess was serving an eight-year prison sentence for aggravated arson. Burgess testified that he and defendant sometimes made jailhouse alcohol. Toward the end of their jail time together, Burgess and defendant were drinking alcohol and talking about birthdays. Defendant mentioned that it would be Silven's birthday were she alive. When Burgess asked defendant what happened, defendant became emotional and started pacing. He told Burgess that Silven had walked in on him while he was smoking meth and said that if he did not stop, she would tell on him. Defendant said he slapped Silven, went berserk, and killed her. Defendant said he had been up for two weeks on meth and he thought his condition might have caused his reaction. Some weeks later, when defendant and Burgess were in the dayroom, defendant told the other inmates there that Silven died as the result of hitting her head on a trampoline. As he said this, defendant winked at Burgess. While Burgess was disturbed by what defendant had told him, he did not immediately go to the authorities. Eventually, Burgess decided to report what defendant had said, believing it was the right thing to do. Although Burgess talked to his attorney before going to the authorities, he did not do so with the intention of getting any benefit on a potential sentence. Burgess acknowledged, however, that before he spoke to the authorities, he had received a plea offer of 22 years in prison and that after he gave a statement, he received an eight-year sentence instead.

¶ 16 Another jailhouse informant, Jeffrey Ahlers, testified that he and defendant were in the same unit of the jail from around August 15, 2007, to mid-October 2007. They became acquainted through Alcoholics Anonymous (AA) meetings. During the meetings, the inmates would discuss religion and how they had hurt their families with their alcohol and substance abuse. Ahlers and defendant talked about "tweaking," which means being awake for an extended period of time while using meth. During such periods, according to Ahlers, a person might become paranoid and do things they would not ordinarily do. Defendant said he had "tweaked" many times while using meth. After one AA meeting, defendant and Ahlers were talking about religion and how someone who had killed another person would not go to heaven. Defendant broke down and began sobbing. He told Ahlers that shortly before Silven was hospitalized, he had been afraid that Silven had either said something or was going to say something about defendant's drug use to a Drug Abuse Resistance Education (D.A.R.E.) officer at her school. The day Silven was injured, defendant had been tweaking and had not slept in a long time. Silven said something that irked him and he lost control and hit Silven in the head. Ahlers testified that defendant said he slapped, punched, hit, and pushed her a few times. Defendant said he realized that he had hurt Silven badly and that his actions had resulted

in her death. Defendant said that Erin was in the corner of the room when this happened and was "freaking out."

¶ 17 Ahlers did not immediately inform the authorities about what defendant had told him. He acknowledged that, in October 2007, the sheriff transported him from the Tazewell County jail to the McDonough County jail, that the sheriff asked Ahlers if he knew anything about defendant's case and that Ahlers said he did not. Shortly before Christmas, Ahlers started thinking about the fact that Silven would never have another Christmas and about Silven's family not knowing who was responsible for her injuries. Ahlers went to the authorities and was interviewed by the sheriff on December 26, 2007. Ahlers denied asking for any consideration on his charges or possible sentences in return for his statement about defendant's case. Ahlers admitted that he made his statement a few days after another inmate, Nathan Wallick, had come into Ahlers' unit. Wallick had been interviewed by the sheriff about defendant's case. Ahlers denied talking to Wallick or another inmate named Nathan Ralph about defendant. He testified that he was not aware that the men said Ahlers had spoken with them about defendant's case. Ahlers acknowledged an extensive criminal history that included several crimes involving dishonesty. He admitted being imprisoned five times for crimes of dishonesty. His convictions included forgery, deceptive practices, and retail theft committed in several different Illinois counties.

¶ 18 A portion of defendant's testimony from his first trial was read to the jury. Defendant testified that he smoked meth numerous times during the week prior to Silven's injury. He stayed up much of the time. The day before Silven was found seizing in her bed, she had complained of some headaches. He and Erin attributed this to Silven's new glasses. She did not seem as active as usual and was clinging to Erin. Defendant took her for a ride on his four-wheeler. Later, Erin put Silven in bed to rest, as she was not feeling well. Erin left to pick up her nephew, Brett. While she was gone, defendant finished what he was doing in the garage and went into the house to take a shower. Silven was lying on her bed with her eyes closed. After Erin returned with Brett, Silven jumped on the trampoline for a little while, but got off saying she wanted to watch Brett jump. Neither defendant nor Erin smoked meth that day. Defendant's testimony was consistent with Erin's with regard to the events surrounding the breakdown of Erik's truck. Later that evening, defendant went to Erin's house to get her diabetes medicine. He stopped to get them something to eat. When he returned, Erin was sleeping on the couch and Silven was asleep in her bed. The next day, Erin woke him about 1 p.m. and stated that Erik was going to pick up some food for lunch. Defendant went into Silven's room. Silven was wheezing and her eyes did not look right. Defendant called for Erin. They tried unsuccessfully to wake Silven up. Erik arrived with Brett and defendant went outside to meet them. He told Erik that something was wrong and to go inside the house. Defendant stayed outside with Brett. Once the paramedics arrived, defendant showed them to Silven's room, but he stayed outside with Brett because Brett was confused and there were several people in Silven's room. At MDH, defendant learned about the nature of Silven's injuries. He did not remember turning his back on Silven in the emergency room. He did not remember much about being at MDH at all. On the way to St. Francis, Erin told defendant that the police had told her at MDH that they knew defendant had injured Silven and they questioned her about what happened. She also told him that one of the doctors had said Silven had been tied at the ankles and sodomized, and that every bone in her body was broken.

Defendant became upset and decided not to go to St. Francis. Defendant pulled the car over to the side of the road and let Erin out of the car to continue on to the hospital with her parents.

¶ 19    After defendant got home, he received a call from Erin's mother telling him not to come to St. Francis. He went to the home of his friends, Scott Kepple and Jill Goodpasture (now Kepple), and asked them if they would try to find out why he was not wanted at the hospital. Defendant testified that he might have asked Kepple and Goodpasture whether they thought someone was going to call the police. His reason for asking this was the phone conversation with Erin's mother and his feeling that she was implying that he had something to do with Silven's injuries. Defendant admitted going to Matt Hocker's house. He testified that he may have made a statement while there about whether he had to worry about the police knocking on his door. However, he did not remember making that statement. After Silven died, defendant felt he was being harassed by the police. He was constantly being pulled over in his car. One officer offered to talk to him about his meth use. Eventually, he called the officer and told him about his meth problem. After he did, defendant was charged with a federal drug offense and jailed. He ultimately received a sentence of 44 months in federal prison.

¶ 20    Defendant testified about the jailhouse informants, Burgess and Ahlers. He admitted becoming acquainted with Ahlers through AA, but he denied telling Ahlers that he had struck Silven or had gone berserk and killed Silven. Defendant also denied telling Ahlers that he believed Silven was going to talk to a D.A.R.E. officer about his meth use. In fact, defendant never spoke to Ahlers about Silven or his family. Defendant did not think Silven knew what drugs were and she never told him she was going to talk to a D.A.R.E. officer. Defendant denied that he and Burgess ever made jailhouse alcohol. Burgess was accumulating items to make the alcohol, but the cells were searched on a daily basis and the items were confiscated. Both defendant and Burgess were disciplined for that. He and Burgess did become friends and defendant would occasionally talk to Burgess about Erin and Silven. He acknowledged telling Burgess about Silven's birthday when Erin sent him a picture of Silven sitting on his front porch with a birthday cake. However, defendant denied telling Burgess that he had struck Silven. Defendant also testified that he never joked about Silven's death or said she had fallen off a trampoline.

¶ 21    Defendant testified that his attorney in his federal case told him not to talk to anyone at the jail about the federal case or any other possible charges because of the presence of jailhouse informants who would give false testimony to obtain a break on their charges or sentencing. Defendant stated that he followed this advice and did not talk to anyone about his legal troubles.

¶ 22    Defendant denied that he caused Silven's injuries. He, Erin, and Erik were the only people who were around Silven during the time when she would have sustained her injuries. Defendant stated that neither Erik nor Erin struck Silven during that time. Defendant admitted he told Erin not to talk to the police anymore and that he advised her to change her cell phone number. He did this because Erin was complaining that the police were harassing her.

¶ 23    The defense presented an affidavit from Burgess's attorney concerning leniency Burgess received on his Tazewell County charges. He was tried on an aggravated arson charge by stipulated bench trial. No agreement was made as to sentencing, but at the request of Burgess's attorney, the McDonough County State's Attorney wrote a letter to the judge concerning

Burgess's cooperation on defendant's case. Burgess was initially sentenced to 12 years in prison, but that sentence was reduced to 8 years on reconsideration.

¶ 24    Mark Godar, a correctional officer at the Tazewell County jail, testified that cell inspections were done every day. Once a week there is a "shakedown" which involves searching each cell for any kind of contraband. In a search of Joseph Burgess's cell in August 2007, officers recovered several bottles of juice, bread wrapped in a sock, a bottle that had contained a cleaning solution, sugar, and candy.

¶ 25    Another correctional officer, Richard Johnston, testified to a disciplinary hearing in which Burgess stated that he intended to use the materials to make "hootch," which is a kind of alcohol. Johnston testified that to his knowledge, no one had successfully made "hootch" in the jail.

¶ 26    Candice Simmons, Erin's cousin, testified that about a year before Silven died, she heard Erin say that if Silven ever told anyone about Erin's drug use, she would "f***ing kill her." Simmons did not actually believe that Erin would kill Silven.

¶ 27    McDonough County Sheriff Rick VanBrooker testified that early on in his investigation, he made up his mind that defendant had killed Silven. When he interviewed Erin, however, he claimed to be searching for the truth. The "theme" of the interviews was that defendant had killed Silven in a meth-induced rage. Despite using several interrogation tactics, Erin never told VanBrooker that defendant injured Silven. In October 2007, while transporting Ahlers to the McDonough County jail, VanBrooker asked Ahlers whether he knew anything about Silven's death. Ahlers said he did not. However, this changed in December 2007 when Ahlers asked to speak to someone about Silven's death. VanBrooker interviewed Ahlers. He denied coaching Ahlers to give a certain version of events. VanBrooker did not follow up on any inconsistencies in Ahlers' statement nor did he confront Erin with the information that defendant had said she was in the room when he attacked Silven.

¶ 28    McDonough County State's Attorney, James Doyle, testified that he did not offer Burgess a deal on his McDonough County charges. Burgess did not ask for anything in return for giving his statement.

¶ 29    Deputy Sheriff John Carson testified that he was the crime scene investigator in Silven's case. He went to MDH and spoke with two doctors. They told him that Silven had traumatic head injuries and other suspicious bruising indicative of abuse. There was an injury on her back with a pattern to it as though it had been caused by a shoe. Carson conducted two searches of defendant's residence in September 2006 with his consent. Carson took photographs of several pairs of shoes, but none of them seemed to match the pattern on Silven's back. No fingerprints were taken and no evidence was sent to the crime lab for DNA testing. Carson did not examine defendant's hands to see if they were injured.

¶ 30    Tessa Pfafman and Gretchen Weiss testified for the defense. Silven and Pfafman's daughter were friends. Silven spent a night at Pfafman's house in June 2006. The next day, Silven did not want to leave, so Pfafman allowed her to stay an additional night. Erin did not show up the following day to pick up Silven and she did not call. Silven ended up staying two additional nights. Pfafman's friend, Gretchen Weiss, picked Silven up and took her to the pool with her own children.

¶ 31    Weiss testified that while they were at the pool, Silven started to cry. Weiss noticed that Erin had arrived to pick Silven up. Weiss thought Silven's reaction was strange, given that she

had not seen her mother for three days. Erin seemed agitated and upset and she spoke harshly to Silven. After Weiss learned that Silven had died, she reported the incident to police.

¶ 32    Jami Hocker testified that she was a friend of Erin's. On Saturday, September 9, 2006, Erin called her to ask if Silven could play with Hocker's children at Hocker's house. Hocker testified that Erin seemed agitated and upset when Hocker told her she was unable to have Silven over to her house. Hocker also testified that Erin was a good mother.

¶ 33    Chris Butcher, school resource officer at Silven's school, testified that one of his responsibilities was teaching the D.A.R.E. program to the fifth grade. He did not teach the D.A.R.E. program to kindergarten students, but he did not recall whether he had gone into the kindergarten classroom at the beginning of the school year in 2006. Butcher testified that he wore his uniform while at the school and that he would attempt to visit all the classrooms in the school.

¶ 34    Forensic pathologist, John Ralstan, testified for the defense. He reviewed Silven's autopsy report and other materials. He agreed that Silven died from multiple blunt force trauma to her head that was inflicted within 12 to 24 hours prior to the onset of symptoms. The blows were severe and caused deep tissue damage to her brain. The injuries were round or oval in shape and could have been caused by a medium-sized cylindrical object. Either a man or a woman could have inflicted the injuries. Ralstan found it doubtful that a hand or knuckles caused the injuries due to the separate nature and size of the injuries.

¶ 35    The jury convicted defendant of first degree murder. The trial court sentenced him to 24 years' imprisonment. Defendant filed a posttrial motion in which his principal argument was that the evidence was insufficient to convict him. He did not raise any issue regarding the trial court's Rule 431(b) admonitions nor did he raise any argument concerning alleged improper comments by the prosecutor during opening statements and closing arguments.

¶ 36    Defendant appealed. He argued that (1) the evidence was insufficient to convict him; (2) the trial court erred in failing to ask potential jurors whether they understood the principles set forth in Rule 431(b) and the evidence was closely balanced; and (3) the prosecutor made improper comments during opening statements and closing arguments. The appellate court rejected defendant's argument that the evidence was insufficient to convict him. The court found that the trial court committed error in failing to ask prospective jurors whether they understood the Rule 431(b) principles. The court conducted plain error review under the first prong of the plain error doctrine and determined that the evidence was closely balanced. The court explained its reasoning:

> "As defendant points out, there were no eyewitnesses who saw defendant commit the crime and no physical evidence to directly link defendant to the crime. The strongest evidence that the State presented was the testimony of the two jailhouse informants regarding defendant's alleged confession to them. As we pointed out in the last trial in this case, although such testimony may ultimately be found to be credible by the trier of fact and may form the basis of a guilty verdict, it must be treated with caution. [Citation.] In addition, the remaining circumstantial evidence presented could have either been viewed as indicative of defendant's guilt or explained innocently away depending on the view of that evidence taken by the jury. Under those circumstances, we find that the evidence was closely balanced." 2013 IL App (3d) 110833, ¶ 91.

¶ 37    The appellate court rejected the State's argument that there is a *de minimis* exception to the closely balanced prong of the plain error doctrine, stating that a defendant is not required to show any additional prejudice beyond showing that the evidence was closely balanced. Because it reversed defendant's conviction and remanded for a new trial, the appellate court did not address defendant's argument concerning the prosecutor's alleged improper comments during opening statements and closing arguments.

¶ 38                                                ANALYSIS

¶ 39    The State raises the following issues in this appeal: (1) whether the appellate court failed to properly apply the closely balanced evidence prong of the plain error rule by looking only at a portion of the State's evidence in isolation, rather than reviewing all the evidence in context; and (2) whether, even if the evidence is closely balanced, reversal is not required unless the error alone likely tipped the scales of justice against defendant. Defendant has cross-appealed, arguing that (1) the evidence was insufficient to convict him of first degree murder; and (2) the prosecutor committed reversible error by comments made during his opening statement and closing argument.

¶ 40                                             State's Appeal

¶ 41    We first address whether the trial court committed error in failing to ask prospective jurors whether they understood the principles set forth in Rule 431(b). This is a question we review *de novo*. *People v. Wilmington*, 2013 IL 112938, ¶ 26. At the time of defendant's second trial, the rule provided:

> "(b) The court shall ask each potential juror, individually or in a group, whether that juror *understands and accepts* the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that the defendant's failure to testify cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's failure to testify when the defendant objects.
>
> The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." (Emphasis added.) Ill. S. Ct. R. 431(b) (eff. May 1, 2007).

¶ 42    The *voir dire* in this case was conducted in panels of six prospective jurors. Following questioning of the first panel, the trial court stated:

> "I'm going to ask some questions of you as a group and if you have an answer other than what's obvious, raise your hand.
>
> The defendant in this case is presumed to be innocent. That principle is one that is essential to our system of justice. Do you all agree with the principle that a person charged with a criminal offense is presumed to be innocent? If there's anyone who doesn't agree with that please [raise] your hand.
>
> The record should reflect there are no hands raised.

The State has the burden of proof and they have to prove the defendant's guilt beyond a reasonable doubt and that burden stay[s] with the State throughout the trial. Do you all accept the principle that the State has the burden of proving a defendant's guilt beyond a reasonable doubt? Again, if there's anyone who can't accept that principle please raise your hand.

The defendant is not required to present any testimony, not required to present any evidence. He is presumed to be innocent. You are not allowed to draw any inference from the fact the defendant chooses to remain silent and not to draw an inference if he chooses not to present any testimony or evidence. Is there anyone who has any quarrel with that principle of law? Again, raise your hand.

The record should reflect there are no hands raised at this time.

Part of that principle is the defendant's not required to prove his innocence. Is there anyone who doesn't agree with that principle? Again, raise your hand.

The record should reflect that [there] are no hands raised."

¶ 43 The trial court followed the same procedure with each of the remaining five panels. Although the language used varied slightly, the questioning of the first panel on the Rule 431(b) principles is representative of the questioning of the other panels.

¶ 44 The trial court asked only whether the potential jurors disagreed with, had any quarrel with, or accepted those principles. In concluding that the trial court failed to comply with the rule, the appellate court relied upon this court's recent decision in *People v. Wilmington*, 2013 IL 112938. There, the trial court admonished the entire group of potential jurors of the Rule 431(b) principles and asked the group as a whole whether any of them disagreed with any of the principles, but the court did not ask the jurors whether they understood those principles. Prior to addressing the defendant's plain error argument, this court considered whether the trial court's omission constituted error. While we noted that it is arguable that the trial court's asking for disagreement, and getting none, is equivalent to the jurors' acceptance of the Rule 431(b) principles, the court's failure to ask the jurors whether they understood the principles is error in and of itself. This court also noted that the trial court did not inquire as to the jurors' acceptance and understanding of the principle that the defendant's failure to testify could not be held against him. *Id.* ¶¶ 28, 32.

¶ 45 *Wilmington* cited a prior decision of this court, *People v. Thompson*, 238 Ill. 2d 598 (2010). That case also involved a failure by the trial court to comply with Rule 431(b). There, the trial court informed the prospective jurors as a group of some of the Rule 431(b) principles. This court found several violations of the rule by the trial court, including that the court failed to ask the prospective jurors whether they both understood and accepted the Rule 431(b) principles. We noted that the language of Rule 431(b) is clear and unambiguous; the rule states that the trial court "shall ask" whether jurors understand and accept the four principles set forth in the rule. The failure to do so constitutes error. *Id.* at 607.

¶ 46 The State concedes in its brief that the trial court here committed error in failing to ask the prospective jurors whether they understood the Rule 431(b) principles. We accept this concession. Based upon *Thompson* and *Wilmington*, we conclude that the trial court committed error when it failed to ask prospective jurors whether they *both* understood and accepted the principles set forth in Rule 431(b). Here, the trial court did not explicitly ask the potential jurors whether they accepted the principles; rather the court asked if they had any disagreement

or quarrel with the principles. As we noted in *Wilmington*, it may be arguable that asking jurors whether they disagreed with the Rule 431(b) principles is tantamount to asking them whether they accepted those principles. However, the trial court's failure to ask whether the jurors understood the principles constitutes error alone. *Wilmington*, 2013 IL 112938, ¶ 32.

¶ 47 Defendant did not object to the trial court's failure to comply with Rule 431(b), nor did he include the issue in his posttrial motion. Thus, defendant forfeited the issue on appeal. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). This court has previously held that Rule 431(b) errors are not structural errors and therefore not *per se* reversible because failure to comply with the rule does not automatically result in a biased jury. *Thompson*, 238 Ill. 2d at 610-11. The appellate court found the evidence closely balanced. Thus, we review whether the appellate court erred in its plain error analysis.

¶ 48 Forfeited errors are reviewable in two instances: (1) where a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error and (2) where a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007); *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005).

¶ 49 The State argues that the appellate court misapplied the closely balanced evidence prong of the plain error test by looking only at a portion of the State's trial evidence in isolation and deeming it less than conclusive. The State argues that the appellate court explicitly refused to perform a qualitative analysis of all of the evidence in context. The State further argues that this court's precedents have recognized that plain error review under the closely balanced prong requires a commonsense, contextual analysis of the totality of the evidence. Defendant agrees that a commonsense, contextual analysis is required by this court's precedents, but disagrees that the appellate court failed to undertake such an analysis. The State further argues that the evidence is not closely balanced in this case, but that even if it is, reversal is not appropriate unless the Rule 431(b) error likely had some impact on the jury's verdict.

¶ 50 The parties are correct that a reviewing court must undertake a commonsense analysis of all the evidence in context when reviewing a claim under the first prong of the plain error doctrine.

¶ 51 *People v. Adams*, 2012 IL 111168, is an example of this court's application of a contextual analysis of the evidence under a claim of plain error. The defendant argued that the prosecutor committed reversible error in comments made during closing argument. *Adams* involved a traffic stop. Officer Boers arrested the defendant for driving on a suspended license. Boers testified that during a search incident to the arrest, he found a small plastic sandwich bag containing a white powdery substance in the defendant's left front pocket. A field test indicated the presence of cocaine. The defendant testified that the plastic bag was lying on the ground and was not in his pocket. He claimed he had never seen it before. He described it as a flat piece of paper with something white on it. The first time he saw it was when Boers pointed to it with his foot and asked the defendant about it. The defendant testified that after he was placed in the backseat of the police car, Boers asked him whether he knew any drug dealers or had any information on guns or killing, and threatened him with prison if he did not provide the requested information. In rebuttal, a second officer, Schumacher, who was at the scene

corroborated Boers' testimony, stating that he saw Boers pull the plastic bag from the defendant's pocket and that Boers did not drop or retrieve anything from the ground. *Id.* ¶¶ 7-12.

¶ 52    This court noted that in making a determination of whether the evidence is closely balanced, a reviewing court must make a commonsense assessment of the evidence within the context of the circumstances of the individual case. We concluded that the prosecutor's comments constituted error, but that the evidence was not closely balanced. Whereas the appellate court had found the evidence closely balanced due to the conflicting testimony of the defendant and the two police officers, this court characterized the evidence as follows:

> "In this case, defendant testified that he was already out of his car when the police arrived but that he did not see any of the officers place anything on the ground. In addition, in explaining why the cocaine could not have been recovered from him, defendant stated that it could not 'have been in anyone's pocket' because it was lying on a flat piece of paper or plastic that 'did not look like a bag.' Thus, the jury heard from defendant the following version of events: A piece of paper or plastic with cocaine on it was sitting in a parking lot. Although unsecured in any way, the cocaine powder had not been disturbed by wind, weather or traffic. By coincidence, defendant parked his car next to the cocaine. In a further coincidence, after defendant was approached by the police, he was escorted to and searched in a spot only inches from the cocaine. Then, when Boers discovered the cocaine on the ground, he conspired on the spot to attribute the drugs to defendant in an apparent attempt to pressure defendant to provide information about other crimes, though there was no indication that the police had ever met defendant or would have reason to believe that he possessed such information. We think it clear from the foregoing that defendant's explanation of events, though not logically impossible, was highly improbable." *Id.* ¶ 22.

¶ 53    In *People v. White*, 2011 IL 109689, in evaluating whether the evidence was closely balanced, this court noted the potential for bias or lack thereof by the witnesses, and the element that fear of the defendant played in the testimony of some of the witnesses. We noted that the State's identification witnesses were completely independent of each other and that it would have been an unlikely coincidence that they all misidentified defendant. On the other hand, many of defendant's witnesses were his friends or family. After performing a qualitative, as opposed to a strictly quantitative, commonsense assessment of the evidence, this court found the evidence not closely balanced. *Id.* ¶¶ 135-39.

¶ 54    The parties here disagree as to whether the appellate court properly determined that the evidence was closely balanced. The appellate court extensively reviewed the evidence adduced at defendant's second trial. Ultimately, the court determined that the testimony of the two jailhouse informants must be viewed with caution, that no physical evidence directly linked defendant to Silven's injuries, that there were no eyewitnesses who saw defendant commit the crime, and that defendant's words and actions in the days following the child's hospitalization were not unequivocally indicative of a guilty conscience, but could be subject to an innocent explanation as well.

¶ 55    We note that, while it is true that the testimony of jailhouse informants must be viewed with caution, the credibility of a government informant, as with any other witness, is a question

for the jury. *People v. Manning*, 182 Ill. 2d 193, 210 (1998). Thus, the testimony of jailhouse informants is not to be viewed as inherently unbelievable.

¶ 56    We disagree with the appellate court and find that the evidence in this case was not closely balanced. While there were no eyewitnesses to the crime, other evidence pointed to defendant as the perpetrator and excluded any reasonable possibility that anyone else inflicted Silven's injuries. The evidence showed that only three people were around Silven during the relevant period prior to her seizures: defendant, Erin, and Erik. Defendant conceded in his testimony from the first trial that neither Erin nor Erik had caused Silven's injuries. Defendant was alone with Silven for short periods of time in the 24 hours prior to her hospitalization. He was smoking meth during this period and stayed up for days at a time. Circumstantial evidence of defendant's words and actions following the discovery of Silven's injuries was presented. One of the paramedics testified that as he was treating Silven, he observed defendant pacing back and forth in the kitchen and saying "Oh, shit; oh damn; and goddamn." Defendant seemed to avoid Silven at the house and in the emergency room at MDH. He decided not to go with Erin to St. Francis, instead returning home. On the night Silven was taken to the hospital, defendant went to the residence of his cousin, Matthew Hocker, and was crying and shaking. He expressed concerns about not being allowed to go to the hospital and wondered aloud if he should be worried about the police contacting him. He expressed the same concerns to Jill Kepple that same evening. Defendant appeared to be nervous and upset. On the morning after Silven was taken to St. Francis, a friend, Michael Skelton, saw defendant walking near the building housing the sheriff's office. Defendant told Skelton that he needed to talk to "them about some shit." Skelton took defendant to the front of the building after he asked how to get inside. Given defendant's concerns expressed to Kepple and Hocker the prior evening about the police contacting him, the most reasonable inference is that "them" referred to the sheriff's office.

¶ 57    Added to the circumstantial evidence is the testimony of Burgess and Ahlers, recounted above. Their testimony must be viewed with caution given that such informants often expect to and do receive consideration on their own charges and sentencing in return for their testimony, thus providing an incentive to testify falsely. We acknowledge that Ahlers, in particular, had been convicted several times of crimes of dishonesty. Ahlers' criminal history, as well as that of Burgess, is only one factor to be weighed in determining their credibility.

¶ 58    Burgess testified that when he asked defendant what happened to Silven, defendant said Silven had walked in on him while he was using meth and said she would tell on him if he did not stop. According to Burgess, defendant said he had not slept for about two weeks while on meth and that he went into a rage and killed Silven. In his own testimony from the first trial, defendant admitted to smoking meth numerous times during the week prior to Silven's death and staying awake for much of that time. Burgess also testified that when defendant spoke to others at the jail about what happened to Silven, he told them Silven had hit her head on a trampoline and then defendant winked at Burgess. The testimony of Burgess and Ahlers was consistent in that they both testified that defendant told them he had been using meth that weekend, that he had not slept, and that he killed Silven after she either said something that irritated him, or told him that she would tell the D.A.R.E. officer at her school that defendant was on drugs. Burgess and Ahlers were not in the Tazewell County jail at the same time. There is no evidence that they communicated about defendant. This lends further credence to their

testimony. While defense counsel tried to suggest that Ahlers had spoken about defendant's case with two other inmates, Ahlers denied this.

¶ 59 Defendant testified that due to his meth use, he had not slept during the weekend prior to Silven's hospitalization. This is consistent with Ahlers' testimony that defendant told him he had been tweaking the weekend Silven was injured. Ahlers testified that a person who was tweaking might become paranoid and behave in an uncharacteristic manner.

¶ 60 There were only three people who could have inflicted Silven's injuries. There is no suggestion that Erik was the perpetrator. Defendant attempted to portray Erin as a bad mother, but this evidence was contradicted by the testimony of defendant's own witnesses. While there was testimony that Erin left Silven in the care of Pfafman for longer than she should have and that she became irritated with Silven when she picked her up, one of defendant's witnesses, Jami Hocker, testified that Erin was a good mother. Further, while Candice Simmons testified that Erin said that if Silven ever told anyone about Erin's drug use, she would kill her, Simmons said that she did not believe Erin was serious.

¶ 61 Although defendant denied that Silven told him she had told or would tell the D.A.R.E. officer about his drug use and he presented testimony from the D.A.R.E. officer that he did not teach the D.A.R.E. program to Silven's class, the officer also testified that he wore his uniform at the school and he tried to visit all the classrooms in the school. The jury could have inferred from this that Silven was aware of the presence of the D.A.R.E. officer at her school.

¶ 62 Viewing the evidence in a commonsense manner in the context of the totality of the circumstances, we conclude that the evidence in this case was not closely balanced. Thus, the appellate court erred in reversing defendant's conviction and remanding for a new trial. Because we find that the evidence was not closely balanced, we need not address the State's argument that a further showing that the error itself likely had some impact on the jury's verdict must be made in first-prong plain error cases.

¶ 63 Cross-Appeal

¶ 64 Defendant argues that the prosecutor committed reversible error by improperly attempting to evoke sympathy for Silven in his opening statement and closing argument. Defendant complains of the following in the prosecutor's opening statement:

> "Friday, September 8th, 2006, was the last healthy and the last happy day in the life of five year old Silven Yocum. Kindergarten student. Her whole future lay ahead of her; promised to be a bright and productive one. This is how she looked when she was ready to go to school on her first day of kindergarten, August 21st, 2006; little back pack, her favorite little red dress. Her smile as she's [waving] to her mom. That's the way I want you to remember Silven."

¶ 65 Defendant also complains of the following remarks made by the prosecutor in his closing argument:

> "Silven Yocum was wise beyond her years. In her brief time on this earth she was eager to begin her journey into her quest for learning. Loved school, just starting out. She was only known by the teachers at Lincoln school for two weeks. They only knew her for two weeks, yet they remember her as a special little girl, even remember her ability in art and that her favorite color was purple.

Silven Yocum, she deserved a lot more tomorrows than yesterdays. It's your time to be the voice of Silven just like Burgess said he couldn't be but would come forward. She's speaking out from these autopsy photos. She's talking to you. She doesn't have a voice any more but you can be the voice for her.

Do this justice for Silven Yocum and for yourselves because you've been chosen to decide this very important issue of why Silven today is not in the fifth grade."

¶ 66 Defendant acknowledges that he did not object to these remarks nor did he include the issue of the alleged improper comments in his posttrial motion. To preserve an alleged error for review, a defendant must both make an objection at trial and include the issue in a posttrial motion. *Enoch*, 122 Ill. 2d at 186. Therefore, defendant has forfeited this issue for review. Defendant asks this court to review his argument under the first prong of the plain error doctrine, asserting that the evidence at his trial was closely balanced. We have previously concluded that the evidence in this case was not in fact closely balanced. Accordingly, there is no need for us to determine whether the prosecutor's comments constituted error.

¶ 67 Defendant next argues that the State failed to prove him guilty of Silven's murder beyond a reasonable doubt. When reviewing a challenge to the sufficiency of the evidence, this court considers whether, viewing the evidence in the light most favorable to the State, " 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis omitted.) *People v. Collins*, 106 Ill. 2d 237, 261 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); see also *People v. Smith*, 185 Ill. 2d 532, 541 (1999). A conviction will be reversed only where the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt. *Id*. at 542.

¶ 68 The appellate court determined that the evidence was sufficient to convict defendant beyond a reasonable doubt. We agree. There is no dispute that Silven suffered blunt force trauma that caused brain damage resulting in her death. Only defendant, Erin, and Erik were around her during the time when she sustained her injuries. There is no dispute that Erik did not cause the injuries. Although defendant presented some evidence purporting to show the possibility that Erin may have inflicted the injuries, when defendant testified and was asked whether Erik or Erin struck Silven, he answered that they did not. Defendant, on the other hand, testified that he was a meth user, that he used meth the weekend of Silven's injuries and that using meth helped him stay awake. Ahlers testified that defendant told him he was "tweaking" that weekend and that when Silven said something that irritated him, he lost control, struck her, and killed her. Burgess testified that defendant broke down and said that when Silven told him she would tell on him for his drug use, he went into a meth-induced rage and struck her. As the appellate court noted, although Ahlers and Burgess were jailhouse informants, they were not in the Tazewell County jail at the same time. Although their testimony must be viewed with caution, they testified similarly concerning what defendant told them about losing control while on meth and killing Silven. It was for the jury to determine whether they were credible witnesses. In addition, the State presented circumstantial evidence tending to show that defendant behaved in a manner indicative of guilt. He decided not to go to St. Francis, he asked two people if they thought the police might come to question him, and he was found walking near the sheriff's office and saying that he had to talk to "them." Defendant also advised Erin to avoid questioning by the sheriff and to change her cell phone number. Viewed in the light most favorable to the prosecution, we conclude the evidence was sufficient

to convict defendant.

¶ 69                                CONCLUSION

¶ 70      We hold that the trial court committed error in failing to comply with Rule 431(b) by not asking the prospective jurors whether they understood the four principles set forth in the rule. We also hold that the evidence in this case was not closely balanced and, thus, plain error review is unwarranted. We further hold that the evidence was sufficient to convict defendant. Accordingly, we reverse the judgment of the appellate court.

¶ 71      Appellate court judgment reversed.

¶ 72      JUSTICE BURKE, specially concurring:

¶ 73      I agree with the majority that the judgment of the appellate court must be reversed. However, my reasons for reaching that result differ from the majority's. I therefore specially concur.

¶ 74                                     I

¶ 75      Following a jury trial, the defendant, Daniel R. Belknap, was convicted of the first degree murder of the five-year-old victim and sentenced to 24 years' imprisonment. On appeal, defendant argued, in part, that his conviction should be reversed because the circuit court failed to comply with Supreme Court Rule 431(b) (Ill. S. Ct. R. 431(b) (eff. May 1, 2007)). This rule requires the circuit court to ask each prospective juror if he "understands and accepts" that the defendant is presumed innocent, that the State has the burden of proof and must prove the defendant guilty beyond a reasonable doubt, and that the defendant's right not to testify may not be held against him. The circuit court in this case asked the prospective jurors if they agreed with and accepted the Rule 431(b) principles, but the court did not separately ask whether they understood them. This was error under *People v. Wilmington*, 2013 IL 112938, ¶ 32 ("the trial court's failure to ask jurors if they *understood* the four Rule 431(b) principles is error in and of itself" (emphasis in original)).

¶ 76      Defendant did not raise the Rule 431(b) error in the circuit court. However, the appellate court concluded it could reach the merits of defendant's contention under the first prong of the plain error rule because the evidence presented at trial was closely balanced. On this basis, the appellate court reversed defendant's conviction and remanded the matter for a new trial. 2013 IL App (3d) 110833.

¶ 77                                    II

¶ 78      The plain error doctrine allows errors not raised in the circuit court to be considered on appeal when either: "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). In this case, the appellate court applied the first prong of the plain error doctrine. The State contends that it did so incorrectly.

- 17 -

¶ 79    According to the State, the appellate court simply concluded that the evidence in this case was closely balanced, concluded that there was error and then, mechanically, concluded there was plain error. The State maintains that the appellate court should have examined the totality of the evidence in a "qualitative" way to determine whether the "evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against him." *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005). The State asserts that recent decisions from this court, such as *People v. Adams*, 2012 IL 111168, and *People v. White*, 2011 IL 109689, have emphasized this "commonsense assessment" of the evidence in determining whether there is plain error and, under this type of analysis, defendant's conviction should be affirmed.

¶ 80    Defendant, in response, does not dispute the State's characterization of the first prong of the plain error test, agreeing that a reviewing court should, when determining whether the evidence is closely balanced, make a commonsense assessment of the evidence "within the context of the circumstances of the individual case." Defendant, however, disputes the State's application of the test in this case. Defendant maintains that the appellate court carefully reviewed the evidence, properly concluded that it was closely balanced and, therefore, properly determined that the Rule 431(b) error was plain error.

¶ 81    The majority rejects defendant's argument. The majority examines the evidence introduced at trial and, in agreement with the State, concludes that it was not closely balanced. Accordingly, the majority holds that defendant failed to establish that the Rule 431(b) error met the first prong of plain error analysis and, therefore, reverses the judgment of the appellate court.

¶ 82    I disagree with both the majority's and the appellate court's plain error discussion because they both assume, without explanation, that the *voir dire* error at issue in this case is suitable for the first prong of plain error analysis. This assumption is incorrect.

¶ 83    A criminal defendant has a constitutional right to trial by an impartial jury. *People v. Strain*, 194 Ill. 2d 467, 475 (2000). Jurors "must harbor no bias or prejudice which would prevent them from returning a verdict according to the law and evidence." *Id.* at 476. To secure this right, inquiry is permitted during *voir dire* " 'to ascertain whether the juror has any bias, opinion, or prejudice that would affect or control the fair determination by him of the issues to be tried.' " *People v. Lobb*, 17 Ill. 2d 287, 300 (1959) (quoting *Connors v. United States*, 158 U.S. 408, 413 (1895)).

¶ 84    When a defendant alleges that his conviction should be reversed because a question went unasked during *voir dire*, the reviewing court must determine whether the unasked question concerns an area of bias that would prevent the jury from returning a verdict according to the facts and law, and whether the bias was incapable of being eliminated by admonitions or instructions given at trial. If these criteria are met, then the defendant has established that he was deprived of his constitutional right to an unbiased jury. See, *e.g.*, *People v. Stack*, 112 Ill. 2d 301, 312-13 (1986) (failure to allow a question regarding the insanity defense deprived the defendant of the right to an impartial jury); *People v. Oliver*, 265 Ill. App. 3d 543, 551 (1994) (same).

¶ 85    Trial before a biased jury is structural error. *People v. Thompson*, 238 Ill. 2d 598, 610 (2010). Structural errors, because they undermine the integrity of the judicial process itself, require automatic reversal of a defendant's conviction, with no consideration given to the nature or amount of evidence introduced at trial. *Id.* at 608. Thus, if a defendant can establish

that a question which went unasked during *voir dire* was necessary to ensure a fair jury, then the verdict must be reversed, regardless of whether the evidence at trial was overwhelming, closely balanced or somewhere in between. The weight of the evidence is simply irrelevant. See *id*.; see also *People v. Glasper*, 234 Ill. 2d 173, 227 (2009) (Burke, J., dissenting, joined by Freeman, J.).

¶ 86    Similarly, the weight of the evidence is also irrelevant if the reviewing court concludes that the unasked question was *not* necessary to ensure a fair jury. In that situation, the defendant would have received exactly what *voir dire* is meant to provide—a fair, impartial jury. Accordingly, there could be no basis for reversal, even if the evidence was closely balanced. Again, the weight of the evidence is irrelevant.

¶ 87    In short, when a defendant contends that his conviction should be reversed because a question went unasked at *voir dire*, the weight of the evidence introduced at trial is of no moment. Either the defendant received a fair and impartial jury or he did not. The trial evidence has no bearing on that question.

¶ 88    Given the above, it is apparent that the first prong of plain error analysis is unsuited for the error at issue here. By definition, the first prong of plain error is concerned with whether the evidence introduced at trial is closely balanced and, if so, whether reversal is warranted in light of that fact. But the weight of evidence has nothing to do with the quality of *voir dire* or whether a defendant received an impartial jury. Necessarily then, the first prong of plain error analysis is inappropriate for determining whether the failure to ask a question at *voir dire* amounts to plain error.

¶ 89                                   III

¶ 90    If plain error occurred in this case, it could only occur under prong two of the plain error analysis, *i.e.*, the fundamental fairness prong. However, this court rejected the argument that the failure to ask a Rule 431(b) question amounts to plain error under prong two in *People v. Thompson*, 238 Ill. 2d 598 (2010). In that case, this court concluded that the Rule 431(b) questions, although required as a matter of supreme court rule, were not necessary to ensure an unbiased jury. *Id*. If the complete absence of a Rule 431(b) question does not result in a biased jury and, hence, plain error under prong two, then the circuit court's error in this case also cannot amount to plain error.

¶ 91    I dissented in *Thompson*. *Id.* at 616-19 (Burke, J., dissenting, joined by Freeman, J.). I expressed the view in *Thompson* that the court's decision was a *de facto* overruling, without acknowledgement or justification, of *People v. Zehr*, which had held that the questions set forth in Rule 431(b) were "vital to the selection of a fair and impartial jury." *People v. Zehr*, 103 Ill. 2d 472, 477 (1984). I acknowledge, however, that *Thompson* is the law. Accordingly, because the error at issue in this case does not amount to plain error under prong two, I agree with the majority that the judgment of the appellate court in this case must be reversed.

¶ 92    JUSTICE FREEMAN joins in this special concurrence.