2021 IL App (2d) 180714-U
No. 2-18-0714
Order filed January 20, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18-CM-525 |
| DESARAY SINSUN, | ) ) | Honorable Brian Dean Shore, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUDSON delivered the judgment of the court.
Justices McLaren and Brennan concurred in the judgment.

**ORDER**

¶ 1   *Held*:   In prosecution for resisting a peace officer, defendant forfeited for appeal her argument that the trial court failed to question the jurors per Supreme Court Rule 431 about their acceptance of the *Zehr* principles.  The error was not reviewable under the closely-balanced-evidence prong of the plain-error doctrine, because though the police officers and defendant gave conflicting accounts, defendant's testimony that she did not resist the officers but that they unprovokedly took her to the ground was highly improbable.

¶ 2   Following a jury trial, defendant, Desaray Sinsun, was convicted of resisting a peace officer

(720 ILCS 5/31-1(a) (West 2018)).  She appeals, contending that the trial court failed to comply

with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) by failing to ask the prospective jurors whether they understood the principles embodied therein. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      Rule 431 requires the trial court to ask prospective jurors whether they understand and accept each of four propositions commonly known as the *Zehr* principles. See *People v. Zehr*, 103 Ill. 2d 472 (1984). Here, the trial court asked the prospective jurors whether they accepted each principle but did not ask whether they understood the principles.

¶ 5      At trial, Carissa Morrissey, a child-protection specialist for the Department of Children and Family Services (DCFS), testified that, on February 27, 2018, she went to defendant's home to investigate a hotline tip about possible abuse or neglect of defendant's son. She knocked on the door several times, but no one answered. She could tell that someone was home, so she called the phone number listed on the report. Bryce Rodriguez, defendant's fiancé, answered. Morrissey explained why she was there. Rodriguez came out onto the porch, followed by defendant. Rodriguez appeared very angry, questioning why Morrissey was there and threatening her. Defendant also came out and was uncooperative.

¶ 6      Morrissey stepped off the porch and called 911 for assistance. When officers arrived a few minutes later, defendant and Rodriguez were still hostile. The officers tried to explain why they were there, but defendant and Rodriguez continued to yell and scream profanities.

¶ 7      At one point, Rodriguez invited Morrissey and the officers into the house, but then stated that he was just kidding and lunged at one of the officers. Morrissey stepped off the porch as Rodriguez was taken to the ground.

¶ 8      Deputy Timothy Kubkowski testified that he was dispatched to defendant's home in response to Morrissey's call. After initially inviting the officers inside, Rodriguez turned and came

up behind Kubkowski. Another deputy, identified only as Wagner, took hold of Rodriguez. Defendant then began to run toward Rodriguez. Out of concern for his partner's safety, Kubkowski pinned defendant against the side of the house and told her multiple times to stop. He said that he would take her to the ground if she did not stop resisting.

¶ 9 Defendant continued trying to pull away from Kubkowski and charge toward Rodriguez, so Kubkowski took her to the ground. Kubkowski and Deputy Troy Zellman handcuffed defendant. Kubkowski sustained a small scratch on his face during the incident. He identified a photo taken that day showing the injury.

¶ 10 Zellman testified that as he approached the home Kubkowski and Morrissey appeared to be arguing with defendant. Defendant seemed to be calming down, but Rodriguez came out and engaged in a lengthy argument with Kubkowski. At some point, Rodriguez told the deputies that they could enter the house. Zellman could not see what happened next because he was directly behind Wagner, but at that point, Wagner ended up taking Rodriguez into custody.

¶ 11 Zellman was helping Wagner handcuff Rodriguez when he saw Kubkowski struggling with defendant, so he ran onto the porch to help Kubkowski. Defendant was "hysterical" and actively resisting Kubkowski. Defendant kept trying to run toward Rodriguez until Kubkowski physically stopped her. Zellman helped Kubkowski handcuff defendant.

¶ 12 Defendant testified that, four days before her arrest on February 27, 2018, she was called to her seven-year-old son's school and informed that he needed a psychological evaluation. Instead of complying with the school's directive, defendant called her son's pediatrician and asked for a referral. She scheduled an appointment for 10 a.m. on February 27. She understood that, as a result of refusing to send him for the requested evaluation, DCFS would be called and she was "fine with that."

¶ 13   At about 9:30 on February 27, 2018, Morrissey came to her home. She wanted to question defendant's son to ensure that he would not harm himself. She asked for permission to enter the home once the police arrived. Defendant and Rodriguez told Morrissey that she could come in and see the children, but Morrissey did not do so. Morrissey asked why defendant's son was not in school. Defendant informed Morrissey that her son had an appointment so that defendant could get a second opinion. Morrissey replied that defendant's son was not going to the appointment and that Morrissey was going to "take him to Swedes."[1] Morrissey left and returned with the police. Defendant told Morrissey that she could come inside to see the children. Morrissey never made it into the house; instead, the gate opened and the officers walked in. Defendant remembered that she had a dog that was loose in the house so she did not open the door immediately. Before she could explain about having to put the dog away, the officers threw Rodriguez over the porch railing into the yard.

¶ 14   Defendant froze. When she asked the police why Rodriguez was being arrested, she was slammed to the ground and handcuffed. When asked on direct examination whether she had a "tussle" with the officers on the porch, defendant said, "No." The police never said anything to her. Morrissey said that she needed to come in, and defendant said that she could. Defendant invited Morrissey to come to her son's appointment, but that never happened.

¶ 15   The jury found defendant guilty, and the trial court sentenced her to 18 months' conditional discharge. Defendant timely appealed.

¶ 16                                      II. ANALYSIS

¶ 17   Defendant contends that the trial court did not comply with Rule 431 when it asked prospective jurors whether they "accepted" the *Zehr* principles but did not ask if they "understood"

_____

[1] This was apparently a reference to SwedishAmerican Hospital in Rockford.

those principles. Rule 431 requires the trial court to ensure that all potential jurors will apply four fundamental concepts commonly known as the *Zehr* principles. Ill. S. Ct. R. 431(b) (eff. July 1, 2012); see *People v. Zehr*, 103 Ill. 2d 472, 477 (1984). The four principles are (1) that the defendant is presumed innocent; (2) that to convict the defendant, the State must prove him or her guilty beyond a reasonable doubt; (3) that the defendant need not present any evidence; and (4) that if the defendant does not testify, it cannot be held against him or her. Ill. S. Ct. R. 431(b) (eff. July 1, 2012). The court must ensure that the jurors both understand and accept each principle. *People v. Thompson*, 238 Ill. 2d 598, 607 (2010). We review *de novo* whether the court complied with Rule 431(b). *People v. Belknap*, 2014 IL 117094, ¶ 41.

¶ 18    The State concedes that, by failing to ask prospective jurors whether they understood the *Zehr* principles, the trial court failed to comply with the rule. However, the State contends that defendant forfeited the issue. Defendant acknowledges that she neither objected to the trial court's failure to comply with Rule 431(b) nor included the issue in a posttrial motion. Thus, she forfeited the issue. See *Belknap*, 2014 IL 117094, ¶ 47.

¶ 19    Forfeited errors, however, are reviewable in two instances: (1) where a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error and (2) where a clear or obvious error occurred and that error is so serious that it affected the fairness of the trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *Belknap*, 2014 IL 117094, ¶ 48. Rule 431(b) errors are not structural unless the failure to comply with the rule results in a biased jury. *Thompson*, 238 Ill. 2d at 610-11. Defendant here does not contend that the error produced a biased jury.

¶ 20    Defendant contends that the error is reviewable under the first prong of plain error because the evidence was closely balanced. In support, she argues that the outcome of the trial turned on a credibility contest in that her testimony stood in stark contrast to that of the State's witnesses. While it is true that when the outcome turns on a credibility contest, the evidence is often closely balanced (*People v. Sebby*, 2017 IL 119445, ¶ 63), this is not always the case. Rather, "a reviewing court must undertake a commonsense analysis of all the evidence in context" when reviewing a first-prong plain error claim. *Belknap*, 2014 IL 117094, ¶ 50.

¶ 21    In this case, the State presented evidence from three witnesses, and the testimony of all three witnesses was mutually corroborative. Here, Morrissey, Kubkowski, and Zellman testified in considerable detail about how defendant and Rodriguez angrily confronted them on the porch. While not all witnesses testified to each aspect of the confrontation, the testimony was consistent that Rodriguez invited the quartet (the aforementioned officers plus Wagner) into his home, only to announce that he was just kidding. He then turned and came up behind Kubkowski as if to attack him. Wagner took Rodriguez down and, with Zellman's assistance, handcuffed him. During this time, defendant attempted to rush toward Rodriguez and had to be restrained by Kubkowski. Defendant continued to resist Kubkowski until he took her to the ground and she, too, was arrested. In the process, Kubkowski received a small scratch on his face. This testimony was corroborated to some extent by a photograph showing that Kubkowski had indeed sustained an injury like the one he described.

¶ 22    By contrast, defendant's testimony was that, while she cooperated completely with Morrissey and invited her into the house immediately, Morrissey decided to wait for the police. When officers arrived, they immediately came onto the porch and threw Rodriguez over the railing for no apparent reason. Then, although defendant said and did nothing in response to this, the

officers threw her to the ground and arrested her as well. On the critical point of whether she resisted, defendant's testimony consisted of a one-word denial that she "tussle[d]" with the officers. Defendant's testimony was not corroborated in any way.

¶ 23    In illustrating what it meant by a "commonsense analysis of the evidence," the *Belknap* court listed several cases where the evidence was not closely balanced even though the defendant's testimony differed from that of the State's witnesses, because the defendant's testimony was inherently farfetched. For example, in *People v. Adams*, 2012 IL 111168, police officers testified that they arrested the defendant for driving on a suspended license and, during a search incident to arrest, found cocaine in his pants pocket. The defendant, by contrast, testified that the cocaine was found on the ground rather than in his pocket. He had never seen it before. After he was placed in the squad car, one of the officers, Boers, began asking him whether he knew any drug dealers. *Belknap*, 2014 IL 117094, ¶ 51 (citing *Adams*, 2012 IL 111168, ¶¶ 7-12). The court described the defendant's version of the event as follows:

> " 'A piece of paper or plastic with cocaine on it was sitting in a parking lot. Although unsecured in any way, the cocaine powder had not been disturbed by wind, weather or traffic. By coincidence, defendant parked his car next to the cocaine. In a further coincidence, after defendant was approached by the police, he was escorted to and searched in a spot only inches from the cocaine. Then, when Boers discovered the cocaine on the ground, he conspired on the spot to attribute the drugs to defendant in an apparent attempt to pressure defendant to provide information about other crimes, though there was no indication that the police had ever met defendant or would have reason to believe that he possessed such information. We think it clear from the foregoing that defendant's

explanation of events, though not logically impossible, was highly improbable.' " *Id.* ¶ 52 (quoting *Adams*, 2012 IL 111168, ¶ 22).

¶ 24 We believe that this is also case in which a defendant's version of events, " 'though not logically impossible, was highly improbable.' " *Id.* ¶ 52 (quoting *Adams*, 2012 IL 111168, ¶ 22). Here the evidence was not closely balanced, thus, we will not overlook defendant's forfeiture of the issue.

¶ 25                                                    III. CONCLUSION

¶ 26 For the reasons stated, we affirm the judgment of the circuit court of Winnebago County.

¶ 27 Affirmed.