**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (3d) 190577-U

Order filed July 16, 2021

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 13th Judicial Circuit, Grundy County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-19-0577 Circuit No. 19-CM-14 |
| STEVEN C. LUNDBERG, | ) ) ) | Honorable Sheldon R. Sobol, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE WRIGHT delivered the judgment of the court.
Justices Lytton and Schmidt concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The circuit court did not commit reversible plain error in failing to question the potential jurors in accordance with Rule 431(b). The circuit court erred by failing to set a restitution amount and payment timeframe during sentencing.

¶ 2    Defendant, Steven C. Lundberg, appeals his conviction for criminal damage to property. Defendant argues the Grundy County circuit court: (1) committed reversible error by failing to ask the potential jurors whether they understood and accepted the principles stated in Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), and (2) erred by failing to specify a restitution

amount or payment timeframe at sentencing. We affirm in part, reverse in part, and remand for further proceedings.

¶ 3                                              I. BACKGROUND

¶ 4        The State charged defendant by information with criminal damage to property (720 ILCS 5/21-1(a)(1) (West 2018)). The charge alleged that defendant "knowingly damaged property of Cecilia Wagner, being a vehicle's soft top cover, *** said damage not being in excess of $500."

¶ 5        During *voir dire*, the circuit court asked the potential jurors to raise their hands to indicate an affirmative response to the court's questions. The court asked whether the potential jurors "disagree[d] with" or "ha[d] any disagreement with the following proposition[s]," and then recited the legal principles contained in Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). The court noted on the record that the potential jurors did not raise their hands to indicate to the court that any juror disagreed with any of the Rule 431(b) principles recited by the court.

¶ 6        At the subsequent jury trial, Ian Gillen testified that on January 9, 2019, he resided in the same household with his mother, Cecilia Wagner, and stepfather, Brett Wagner. On that date, as Gillen drove his mother's vehicle to work, he noticed the soft cover to his mother's vehicle had been damaged.

¶ 7        Cecilia testified that on the morning of January 9, 2019, Gillen told her that someone had "slashed up" her vehicle. Cecilia went outside and observed several holes cut through the soft cover on her vehicle. The Wagner's residence was equipped with multiple security cameras, one of which pointed at the driveway where Cecilia's vehicle was parked. Cecilia testified that after viewing the surveillance footage from her security cameras, she informed law enforcement that she believed her neighbor, defendant, was the person in the footage, saying "I thought it was my neighbor, [defendant], because of the way he walk[ed]." Cecilia stated that she was "used to

2

[defendant], what he looked like." On cross-examination, Cecilia admitted that during the last year, the relationship between Cecilia and defendant had been problematic.

¶ 8     Following Cecilia's testimony, the State entered the surveillance footage into evidence and played the video recording for the jury. The footage depicted an individual approach the driveway from the left side of the screen while carrying an object in their hand. The individual's face was not visible as the person approached the driver's side of Cecilia's vehicle and cut a hole in the soft top of the vehicle. Next, the video depicted the same individual moving to the back of the vehicle and slashing additional holes in each side of the soft top cover of Cecilia's vehicle. The individual enlarged the holes in the soft top with his or her hands. Thereafter, the individual retraced his or her steps and disappeared from the driveway after walking out of sight on the left side of the screen.

¶ 9     Cecilia's son, Gillen, also reviewed the surveillance footage and informed the jury that he observed a "man that appeared to look like [defendant] had a shirt or something wrapped around his face and went right back in the direction of his house." Gillen testified that, later in the day after noticing the damage to Cecilia's vehicle, he witnessed defendant riding a bicycle past his mother's residence. As defendant rode past his mother's damaged vehicle, defendant spat on the vehicle and stated, "[W]hat's done is done." Gillen followed defendant and punched him in the face. According to Gillen, "[t]hings were building up. I knew who had done this. *** [Defendant] was wearing the same clothes in the video as when I saw the next day [*sic*]. I just lost my cool ***."

¶ 10    Cecilia's husband, Brett, also testified that he viewed the surveillance footage. During his testimony, Brett stated that he observed "a person walk up the driveway covering their face, [who] also had a weapon in the other hand. First [they] went to the driver's side, slashed that.

3

Went to the back, slashed that. Went to the passenger side, slashed that. Exited the driveway and went back to the left." Brett said that defendant was their next-door neighbor to the left side. According to Brett, his family's relationship with defendant was "[t]oxic," though the court prevented Brett from providing further details.

¶ 11    Officer Kiedra Meece of the Minooka Police Department testified that she spoke with Gillen about the damage to the soft cover of Cecilia's vehicle. Meece also viewed the surveillance footage and informed the jury that the video depicted a person approach the driveway from the north and walk around the sides and rear of the vehicle, stopping to cut holes in the vehicle's soft cover and using both hands to expand those holes.

¶ 12    Later that day, Meece responded to a call two blocks away from the Wagner's residence. When she arrived at the location, a hardware store, she observed defendant was present and was bleeding from his head. As Meece spoke with defendant, she noticed that defendant appeared to be wearing the same clothing as the person captured in the surveillance footage damaging Cecilia's vehicle. Meece placed defendant under arrest, collected and photographed defendant's clothing, and photographed the holes in the damaged soft cover. Meece's photographs were admitted as prosecution exhibits.

¶ 13    Defendant testified on his own behalf. First, defendant denied that he was the person depicted in the surveillance footage. Defendant testified that, on January 9, 2019, he was riding his bicycle when Gillen approached him and struck him in the face. Defendant denied spitting at Gillen and saying, "[W]hat's done is done." Defendant also denied walking past the Wagner's house or speaking with Gillen, as a court order forbid him from having any contact with Gillen, Cecilia, or Brett. Defendant asserted that, at the time in question, he was disappointed because he

4

loaned Gillen money, but Gillen refused to repay him. According to defendant, Gillen said, "[Y]ou're not getting a dime back, you're not getting a penny back."

¶ 14    The jury found defendant guilty of the charged offense. Defendant filed a motion for a new trial and judgment notwithstanding the verdict.

¶ 15    At a hearing on July 23, 2019, the parties presented an agreed upon sentence of 24 months' conditional discharge to the court. The court noted that the agreement failed to include a restitution amount or payment plan. On this basis, the court refused to "approve that sentence without restitution." At the subsequent hearing, on August 20, 2019, the State informed the court that the Wagners had not yet provided a definitive damages amount, so they could not establish the proper restitution amount. The court sentenced defendant to 24 months' conditional discharge and reserved the restitution amount and payment timeframe until the next court date, November 1, 2019.

¶ 16    The court denied defendant's motion for a new trial and judgment notwithstanding the verdict. Defendant filed his notice of appeal before a restitution amount had been determined by the circuit court.

¶ 17                                    II. ANALYSIS

¶ 18                                    A. Rule 431(b)

¶ 19    Defendant argues that he is entitled to a new trial because the circuit court failed to comply with Rule 431(b) when selecting a jury. Defendant acknowledges he failed to preserve this issue for appellate review by objecting during *voir dire*. Defendant also admits that he did not include this issue in his posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Defendant contends that the Rule 431(b) error qualifies as plain error because the evidence in

this case was closely balanced. The State concedes that the court erred but argues the evidence was not closely balanced.

¶ 20    The plain error doctrine permits us to consider a forfeited error where the evidence was "so closely balanced that the jury's guilty verdict may have resulted from the error and not the evidence" or where the error was "so serious that the defendant was denied a substantial right, and thus a fair trial." *People v. Herron*, 215 Ill. 2d 167, 178-79 (2005). "A Rule 431(b) violation is not cognizable under the second prong of the plain error doctrine, absent evidence that the violation produced a biased jury." *People v. Sebby*, 2017 IL 119445, ¶ 52. "The first step of plain-error review is determining whether any error occurred." *People v. Thompson*, 238 Ill. 2d 598, 613 (2010).

¶ 21    Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) mandates the following:

> "The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's decision not to testify when the defendant objects.
>
> The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section."

¶ 22    Rule 431(b) requires a circuit court to ask potential jurors "whether they *understand* and *accept* the enumerated principles." (Emphasis in original.) *People v. Wilmington*, 2013 IL

112938, ¶ 32; see Ill. S. Ct. R. 431(b) (eff. July 1, 2012). Where, as here, a court merely asks whether the potential jurors disagree with the legal principles, it fails to comply with Rule 431(b). See *Wilmington*, 2013 IL 112938, ¶ 32 ("While it may be arguable that the court's asking for disagreement, and getting none, is equivalent to *acceptance* of the principles, the trial court's failure to ask jurors if they *understood* the four Rule 431(b) principles is error in and of itself." (Emphasis in original.)). Thus, we accept the State's concession, as the court did not ask whether the potential jurors understood and accepted the four Rule 431(b) principles.

¶ 23    However, the circuit court's failure to satisfy Rule 431(b) was not called to the attention of the circuit court by defendant and has been forfeited for purposes of this appeal. After carefully reviewing the record, we conclude defendant's forfeiture is not excused based on plain error because the evidence contained in this record was not closely balanced. When reviewing a claim under the first prong of the plain error doctrine, "a reviewing court must undertake a commonsense analysis of all the evidence in context." *People v. Belknap*, 2014 IL 117094, ¶ 50.

¶ 24    In this case, the jury was able to observe a person committing the crime as depicted in the surveillance video. After viewing the same footage, three State witnesses testified that they believed defendant to be the person captured on video slashing the soft cover of the vehicle. Meece testified that when she confronted defendant later on the date of the incident, the clothing worn by defendant at that time matched the clothing Meece observed being worn by the person in the surveillance footage published to the jury. The jury could easily have drawn the same conclusion after reviewing the State's video exhibit.

¶ 25    Similarly, Gillen testified that when Gillen encountered defendant on the same date, Gillen opined that defendant was wearing the same clothing as the person depicted in the footage. Further, Gillen testified that he witnessed defendant spit at the vehicle, later in the day,

just before he heard defendant state, "[W]hat's done is done." It was within the province of this jury to decide whether defendant's statement, as described by Gillen, should be treated as a spontaneous and incriminating admission by defendant. Although defendant denied this incriminating statement occurred and denied that he was the individual slashing the soft top of the vehicle in the surveillance footage, the evidence linking defendant to the criminal damage to property far outweighed defendant's version of the events. Therefore, we conclude that plain error does not excuse defendant's forfeiture of the purported judicial error during *voir dire* since the prosecution's evidence was not closely balanced.

¶ 26                                    B. Restitution

¶ 27         Finally, defendant argues the circuit court erroneously failed to properly assess a finite amount of restitution. The State concedes error but argues the proper remedy requires this court to remand the matter to the circuit court rather than deleting the language referring to restitution in the sentencing order. The state's concession of error is supported by section 5-5-6 of the Unified Code of Corrections (Code), requiring a circuit court to determine at the time of sentencing "whether the defendant should be required to make restitution in cash, for out-of-pocket expenses, damages, losses, or injuries found to have been proximately caused by the conduct of the defendant." 730 ILCS 5/5-5-6(a) (West 2018). Additionally, the statute provides that the court "shall determine whether restitution shall be paid in a single payment or in installments, and shall fix a period of time not in excess of 5 years *** within which payment of restitution is to be paid in full." *Id.* § 5-5-6(f). Other courts have held that " 'If the court does not specify a particular time [for the payment of restitution], the restitution order is fatally incomplete.' " *People v. Hibbler*, 2019 IL App (4th) 160897, ¶ 82 (quoting *In re Estate of Yucis*, 382 Ill. App. 3d 1062, 1067 (2008)).

8

¶ 28    We decline defendant's invitation for this court to delete the possibility of restitution from the sentencing order because faced with a similar sentencing error, other courts have remanded the matter for statutory compliance. See *Hibbler*, 2019 IL App (4th) 160897, ¶ 83; see also *People v. Stinson*, 200 Ill. App. 3d 223, 225 (1990) (holding that vacatur of an incomplete restitution order and remand for statutory compliance "is the better practice" than reversal without remand). Illinois Supreme Court Rule 472(a) (eff. May 17, 2019) governs the correction of certain sentencing errors.

¶ 29    In addition, while restitution does not qualify as a fine, fee, assessment, or cost subject to the requirements of Rule 472 (*People v. Copeland*, 2020 IL App (2d) 180423, ¶¶ 15-17), we consider that rule to provide some guidance on the best remedy for the circuit court's error. Therefore, we remand the matter to the circuit court to address, on the record, whether or not the defendant has the ability to pay restitution, to determine whether restitution is appropriate, and if so, to fix the amount of restitution and order the conditions for the payment of restitution pursuant to section 5-5-6 of the Code.

¶ 30                          III. CONCLUSION

¶ 31    The judgment of the circuit court of Grundy County is affirmed in part, reversed in part, and remanded for further proceedings.

¶ 32    Affirmed in part, reversed in part.
¶ 33    Cause remanded.