2022 IL App (1st) 200471-U

FIFTH DIVISION
Order filed: July 8, 2022

No. 1-20-0471

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Respondent-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 2004 CR 17601 02 |
| | ) | |
| HANNIBAL EASON, | ) | Honorable |
| | ) | Lawrence E. Flood, |
| Petitioner-Appellant. | ) | Judge, presiding. |

JUSTICE HOFFMAN delivered the judgment of the court.
Presiding Justice Delort and Justice Cunningham concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The defendant forfeited a postconviction claim when its basis was apparent on the original appellate record and he failed to raise the claim on direct appeal, and the defendant failed to demonstrate, as component of claim of ineffective assistance of appellate counsel, that trial court's noncompliance with Supreme Court Rule 431(b) amounted to clear error when the evidence in the case was not closely balanced.

¶ 2   The defendant, Hannibal Eason, appeals from the second-stage dismissal of his petition for postconviction relief filed under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.*

(West 2014)). We agree with the postconviction court's dismissal of the two claims that the defendant challenges on appeal, and we affirm the court's order.

¶ 3    The following facts are taken from the filings and exhibits of record, with the recitation of trial testimony taken from our unpublished order affirming the defendant's convictions on direct appeal. See *People v. Eason*, 2012 IL App (1st) 092927-U.

¶ 4    The defendant was charged with first degree murder and armed robbery for the shooting of a fellow bus passenger. At trial, the State's theory of the case was that the defendant and Billy Johnson followed the victim, William Jones, off a bus to rob him, and that Johnson fatally shot Jones during the encounter. Joyce O'Neil, a bystander on the bus, testified that, on the night of the shooting, she saw the defendant and two companions—later identified as Johnson and Allen Faulkner—near the victim at a bus stop. She stated that she boarded a bus with all four men. She recalled that the defendant, who appeared to have a hearing impairment, was "looking at" the victim while they waited at the bus stop and "staring at" the victim during the bus ride. O'Neil said that the defendant began "frantic[ally]" communicating in sign language with Johnson during the bus ride, while Faulkner talked to other passengers. She also recalled that one of the three men in the defendant's group had a bottle of alcohol sticking partly out of a pants pocket. O'Neil left the bus at the same time as the three men and the victim, and she saw the defendant and Johnson "walking fast" to follow the victim, while Faulkner remained uninvolved. The victim, the defendant, and Johnson disappeared behind a white van, and O'Neil then heard three gunshots.

¶ 5    Faulkner testified (through the use of American Sign Language (ASL) and an interpreter) that the defendant and Johnson, among other people, gathered at his house on the day of the shooting, and, during the gathering, Johnson showed a gun to the group. After an initial denial,

Faulkner agreed when confronted with his grand jury testimony that he had seen the defendant hold the gun during the gathering. Faulkner said that Johnson told the group he planned to commit a robbery. Faulkner declined to participate, "so [Johnson] asked [the defendant] [']you want to go rob somebody.' They started talking." At that point, Faulkner said, he left the room.

¶ 6 Faulkner said that he, Johnson, and the defendant consumed vodka Johnson had brought in a gallon jug and smoked marijuana before leaving Faulkner's home. Later in the night, the group of three men boarded a bus and saw the victim. At that point in the night, Faulkner said, the defendant was carrying the vodka bottle in a bag. Faulkner testified that, on the bus, "it looked like [Johnson] was messing with [the victim] and [he and the defendant] [were] trying to talk about robbing [him] and they [were] looking at him, making him afraid." Faulkner, however, focused his attention on talking to other passengers. When the four got off the bus, Faulkner continued to talk to other people, but he saw Johnson and the defendant chase the victim. According to Faulkner, the defendant "whacked the guy" with the vodka bottle. The victim then put his hands up, a struggle ensued, and flashes of gunfire emanated from the area. The defendant and Johnson ran soon thereafter, and Faulkner also ran when he saw that the victim had been killed. Faulkner said that he saw the defendant and Johnson later at his house. Despite being confronted with his grand jury testimony stating the opposite, Faulkner denied having seen the defendant go through the victim's clothes after the shooting. However, he confirmed that he saw the defendant with a cellular phone after the shooting. On cross-examination, Faulkner stated that he did not recall telling police that the defendant was not involved in the shooting.

¶ 7 Cedric Currin (also testifying in ASL through an interpreter), one of the people who gathered at Faulkner's house prior to the shooting, recalled that Johnson was showing his gun to

other people at the house. According to Currin, the defendant "really checked the gun out. He was really analyzing it." Currin later saw Johnson and the defendant talking to each other. Currin left the home wondering if he should alert others to the possible trouble.

¶ 8      Andrew Buchanan (likewise testifying with the assistance of an interpreter), another person at the gathering, testified that the defendant seemed impressed by the gun. Buchanan disagreed with his prior grand jury testimony, in which he said that the defendant reacted to the gun by saying "I feel like robbing somebody." He also denied knowing that the defendant and Johnson agreed to commit a robbery, despite so testifying before the grand jury. Buchanan, who was at Faulkner's home after the incident as well, testified that the defendant returned with a cellular phone, but he said that the defendant did not explain where he obtained the phone. However, Buchanan was again impeached by his grand jury testimony that the defendant admitted taking the phone from the victim.

¶ 9      Troy Williams, a police officer who was off duty at the time of the shooting, testified that he saw the defendant and Johnson following the victim and then heard three gunshots. Williams, however, did not see the actual shooting. The parties stipulated that, if called as a witness, a medical examiner would testify that he observed gunshot wounds on the victim's body, as well as lacerations on the front and back of the victim's head.

¶ 10     At the close of the State's case, the trial court denied the defendant's motion for a directed verdict, and the defense rested after presenting a stipulation that a police detective would testify that Faulkner told him the defendant was not involved in the shooting.

¶ 11     Following closing arguments and deliberation, the jury returned its verdict finding the defendant guilty of first degree murder and armed robbery. The court sentenced the defendant to

38 years in prison. We affirmed the judgment on direct appeal. See *Eason*, 2012 IL App (1st) 092927-U.

¶ 12    In 2014, the defendant filed a *pro se* postconviction petition raising numerous claims for relief. The postconviction court appointed counsel for the defendant, who filed a supplemental petition raising eleven more claims for relief, as well as a subsequent addendum to the supplement. Among the many claims filed by the defendant and postconviction counsel, only two are at issue in this appeal. The first relates to the use of grand jury testimony as impeachment material at the defendant's trial. Three of the witnesses at the trial, Faulkner, Buchanan, and Currin, are either deaf or hard of hearing (as is the defendant) and testified at both the grand jury proceeding and the trial in American Sign Language (ASL). However, the defendant asserted in his petition that the ASL interpretation procedures used at the grand jury proceeding were insufficient to produce reliable testimony, rendering the grand jury testimony of the three witnesses inadmissible at trial. The defendant claimed in the petition that the use of that grand jury testimony at trial violated his rights to due process and equal protection. Alternatively, the defendant claimed that trial counsel rendered ineffective assistance by not objecting to the use of the grand jury testimony. In the second claim at issue in this appeal, the defendant asserted that his appellate counsel rendered ineffective assistance by not arguing that the trial court had failed to comply with Supreme Court Rule 431(b) during jury selection by not properly explaining all four principles contained in the rule and by not asking the venire if they understood and accepted those principles.

¶ 13    The State moved to dismiss the defendant's postconviction petition. Following argument on the State's motion, the postconviction court granted the motion and dismissed the defendant's petition in its entirety. The defendant now appeals the dismissal of his petition, specifically

contesting the dismissal of the two claims concerning the use of grand jury testimony and the trial court's noncompliance with Rule 431(b).

¶ 14    In noncapital cases, the Act provides for three separate stages. At the first stage, the postconviction court examines the petition to determine if it is frivolous or patently without merit and dismisses the petition if it qualifies as either. *People v. Johnson*, 2021 IL 125738, ¶ 24. If the petition survives the first stage, it then moves on to the second stage, where the court may appoint counsel, who may then amend or supplement the defendant's original petition. *Id.* ¶ 27. The State may then file a motion to dismiss, and the court may hold a hearing on that motion. *Id.* When evaluating a petition at the second stage, "the circuit court must determine whether the petition and any accompanying documentation make 'a substantial showing of a constitutional violation.' " *People v. Tate*, 2012 IL 112214, ¶ 10 (quoting *People v. Edwards,* 197 Ill. 2d 239, 246 (2001)). If the petition survives the second stage, it proceeds to a third-stage evidentiary hearing. *Johnson*, 2021 IL 125738, ¶ 27. The court in this case dismissed the defendant's petition at the second stage following a motion to dismiss filed by the State. We review such an order *de novo*, showing "no deference to the postconviction court's judgment or reasoning." *Id.*

¶ 15    The first claim at issue on appeal consists of two parts: a primary argument that the use of grand jury testimony at trial violated the defendant's rights to due process and equal protection, and an alternative argument that trial counsel's failure to object to the use of the grand jury testimony amounted to ineffective assistance. However, we do not reach the merits of either argument because the defendant forfeited this claim by failing to raise it on direct appeal.[1]

---

[1] The defendant did not raise a second alternative argument that, in event of forfeiture, appellate counsel was ineffective for failing to raise the issue on direct appeal, so we do not address that possibility.

¶ 16    "The purpose of a postconviction proceeding is to permit inquiry into constitutional issues involved in the original conviction and sentence that were not, and could not have been, adjudicated previously on direct appeal." *People v. English*, 2013 IL 112890, ¶ 22 (citing *People v. Harris*, 206 Ill. 2d 1, 12 (2002)). "[I]ssues that could have been raised on direct appeal, but were not, are forfeited." *Id.* (citing *People v. Ligon,* 239 Ill. 2d 94, 103 (2010)). This rule applies to the claim presently at issue regardless of whether it is viewed as an alleged violation of due process or equal protection (see, *e.g.*, *People v. Newman*, 365 Ill. App. 3d 285, 289 (4th Dist. 2006)) or ineffective assistance of trial counsel (see, *e.g.*, *People v. Veach*, 2017 IL 120649, ¶ 46).

¶ 17    However, the forfeiture doctrine may be relaxed "where fundamental fairness so requires, where the forfeiture stems from the ineffective assistance of appellate counsel, or where the facts relating to the issue do not appear on the face of the original appellate record." *English*, 2013 IL 112890, ¶ 22 (citing *People v. Williams,* 209 Ill. 2d 227, 233 (2004)). Indeed, the defendant in this case argues that the basis for the claim did not appear in the original appellate record and, therefore, was not forfeited. But we find this argument belied by the record.

¶ 18    At the core of this first claim are three alleged infirmities in the grand jury testimony that the defendant asserts undermine the reliability of the testimony taken at that proceeding. First, the defendant notes that only one interpreter handled the grand jury proceedings, rather than the team of at least seven interpreters who worked the defendant's trial. Citing an Americans with Disabilities Act handbook, the defendant contends that the use of a single interpreter increases the risk of inaccurate interpretations due to interpreter fatigue. He also explains that the use of multiple interpreters allows the interpreters to confer and resolve possible areas of confusion in an interpretation, as happened at trial on at least one occasion.

¶ 19    Second, the defendant asserted that the record did not contain the qualifications of the interpreter who handled the grand jury proceeding. He claims that it is important to know whether the interpreter was a Certified Deaf Interpreter (CDI), a more specialized class of interpreter whose presence, the defendant contends, is necessary to ensure the level of accuracy required in legal settings.

¶ 20    Third, the defendant noted that the grand jury proceeding was not videotaped, leaving the parties and the court with no ability to rewatch the proceeding to verify the accuracy of the interpreted testimony as it was reflected in the written transcript.

¶ 21    However, all of these alleged infirmities were apparent in the original appellate record. First, the written transcript of the grand jury proceeding demonstrated that only one interpreter was present. The introductory pages listing the parties who were present listed only one interpreter, and in the body of the testimony only one interpreter was sworn in. Second, the absence of the interpreter's credentials and qualifications was similarly apparent from the transcript of the grand jury proceeding, which did not contain any mention of the interpreter's credentials or any indication that the interpreter was a CDI. Third, the lack of videotaping was self-evident; if there was no videotape in the record and no comment in the transcript about the proceeding being videotaped, it would have been safe to assume that no tape existed.

¶ 22    The defendant counters with two points of rebuttal. First, he contends that the State forfeited the ability to raise forfeiture in this appeal by not raising that argument below. However, the State did raise forfeiture below, asserting in its motion to dismiss that the defendant's due-process, equal-protection, and ineffective-assistance-of-trial-counsel claims were forfeited because they could have been raised on direct appeal. The State also argued at the hearing on the

motion to dismiss that all ineffective-assistance-of-trial-counsel claims and issues related to the interpretation of the grand jury testimony were apparent from the record and, therefore, should have been raised on direct appeal. Accordingly, the State did not forfeit this argument.

¶ 23    Second, the defendant alleges that this claim relied on scholarly authorities that were not present in the original record, and he contends that Illinois law would have prevented him from supplementing the record with those authorities. See, *e.g.*, *People v. Vara*, 2018 IL 121823, ¶ 22 (noting that "[a]mendment of the record is not to be used as a device for inserting extraneous materials into the record on appeal"). However, a party may cite non-legal scholarly authorities in support of an argument regardless of whether those authorities are in the record on appeal. See *In re M.M.*, 156 Ill. 2d 53, 56 (1993) ("[Supreme Court Rule 341] expresses no restriction on the nature or source of material which may be cited in support of an argument. Whether the authority cited may be nonprecedential, irrelevant, or incomplete will be determined by the reviewing court as a proper consideration in assessing the merits of a proponent's argument."); *In re Marriage of Schmitt*, 391 Ill. App. 3d 1010, 1017 (2d Dist. 2009) (noting that parties may cite secondary authorities in support of their arguments); see also *People v. McKown*, 226 Ill. 2d 245, 273–74 (2007) (considering a group of scientific papers cited as supporting authority). There was no need for the defendant to rely on only authorities contained in the record, and he could have brought this claim on direct appeal with citations to scientific or scholarly authorities supporting his arguments regarding the unreliability of the grand jury testimony. Therefore, because the basis for the claim was apparent in the original appellate record, the defendant forfeited his claim regarding the use of grand jury testimony by not raising it on direct appeal.

¶ 24    The second claim at issue in this appeal concerns the trial court's alleged noncompliance with Supreme Court Rule 431(b). That rule requires the trial court to ask during jury selection whether each potential juror understands and accepts four principles concerning (1) the presumption of innocence, (2) proof beyond a reasonable doubt, (3) the defendant's right to not present evidence on his or her behalf, and (4) the defendant's right to not testify in his or her defense. See *id.* In his postconviction petition, the defendant claimed that appellate counsel rendered ineffective assistance by not arguing that the trial court failed to comply with the requirements of Rule 431(b) by entirely omitting any reference to the third and fourth principles and by failing to adequately ask whether the prospective jurors understood and accepted all four principles. The postconviction court denied this claim on the merits, finding that the defendant failed to demonstrate ineffective assistance.

¶ 25    "Claims of ineffective assistance of appellate counsel are measured against the same standard as those dealing with ineffective assistance of trial counsel." *People v. Childress*, 191 Ill. 2d 168, 175 (2000). That is, the defendant "must show that the failure to raise an issue on direct appeal was objectively unreasonable and that the decision prejudiced [the defendant]." *Id.* (citing *People v. West,* 187 Ill. 2d 418, 435 (1999)). In order to demonstrate prejudice, the defendant must show that the issue would have been meritorious. *Id.* Accordingly, an answer to the prejudice inquiry requires a determination of whether the underlying claim of trial court error "would have been successful if raised on direct appeal." *Id.* In other words, to determine if a defendant was prejudiced by appellate counsel's failure to raise an issue, we must review the issue as though it were being raised on direct appeal and determine whether the defendant's argument would have resulted in relief. See *id.*

- 10 -

¶ 26    The defendant in this case asserted in his petition that, because trial counsel forfeited the issue on appeal by not objecting or otherwise raising any complaint regarding the trial court's noncompliance with Rule 431(b) (see *People v. Stuckey*, 2011 IL App (1st) 092535, ¶ 28), appellate counsel should have raised the trial court's failure to comply with Rule 431(b) as plain error, a doctrine that allows for appellate review of unpreserved errors. Because a claim of ineffective assistance of appellate counsel requires the defendant to prove that appellate counsel had a meritorious argument to raise, the defendant in this case must show that the trial court's alleged violation of Rule 431(b) did indeed amount to plain error, thereby establishing that the defendant was prejudiced by appellate counsel's failure to raise the issue. See *Childress*, 191 Ill. 2d at 175 ("Unless the underlying issue is meritorious, petitioner suffered no prejudice from counsel's failure to raise it on direct appeal.").

¶ 27    The plain-error doctrine allows a reviewing court to consider an unpreserved error when

"(1) a clear or obvious error occurs and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurs and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

The defendant's claim in this case focuses on the first of these prongs, arguing that the trial court committed a clear error and that the evidence was so closely balanced that the error threatened to tip the balance of the scales of justice against the defendant.

¶ 28    The first step in a first-prong plain-error analysis is to determine whether the trial court committed a clear or obvious error. See *People v. Belknap*, 2014 IL 117094, ¶ 41. The State in this case concedes on this point and acknowledges that the trial court failed to comply with the requirements of Rule 431(b) by not addressing the third principle and by not asking the prospective jurors if they understood and accepted the four principles. Our focus, therefore, is solely on the second component of the analysis, whether the defendant was prejudiced by the error.

¶ 29    In order to demonstrate prejudice, the defendant must show that the evidence was closely balanced. See *People v. Sebby*, 2017 IL 119445, ¶ 51 (explaining that when a defendant establishes that the evidence was so closely balanced that the court's noncompliance with Rule 431(b) threatened to tip the scales of justice the defendant has shown that the error was actually prejudicial); *Belknap*, 2014 IL 117094, ¶ 62 (finding no prejudice from the trial court's failure to comply with Rule 431(b) when the evidence was not closely balanced). "In determining whether the evidence adduced at trial was close, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *Sebby*, 2017 IL 119445, ¶ 53 (citing *Belknap*, 2014 IL 117094, ¶¶ 52–53). The defendant carries the burden of establishing first-prong plain error. *Id.* ¶ 51.

¶ 30    Our review of the evidence leads us to conclude that the evidence was not so closely balanced that the trial court's failure to properly instruct the prospective jurors on the Rule 431(b) principles threatened to tip the scales of justice. Joyce O'Neil, an unbiased bystander, testified that she saw the defendant "looking at" the victim while they waited for the bus and "staring at" the victim during the bus ride. According to O'Neil, the defendant at one point switched seats to be directly behind the victim and "frantic[ally]" communicated in sign language with Johnson during

the bus ride. O'Neil got off the bus at the same time as the defendant, Johnson, and the victim, and she saw the defendant and Johnson "walking fast" to follow the victim. Soon after the three men disappeared behind a white van, O'Neil heard three gunshots.

¶ 31 Even if we were to ignore Faulkner's and Buchanan's grand jury testimony regarding the defendant's alleged interest in Johnson's gun and the defendant's alleged desire to participate in a robbery or shooting (testimony that the defendant maintains was unreliable), O'Neil's testimony alone provided strong evidence that the defendant was a willing participant in the murder, and the defendant has not pointed to any exculpatory evidence of substantially similar weight to make the case closely balanced. Instead, he notes the absence of physical evidence, the lack of a confession, and the existence of inconsistencies in the testimony of other witnesses, primarily Faulkner, on other matters. But these points do not undermine O'Neil's strongly incriminating testimony describing the events leading to the murder, testimony that was, where possible, corroborated by bus surveillance video. And if we were to add in the testimony provided by Faulkner, Buchanan, and Currin suggesting that the defendant had expressed a keen interest in engaging in a robbery or shooting, the picture only becomes bleaker for the defendant.

¶ 32 Because the evidence was not closely balanced, the defendant has failed to carry his burden of proving plain error. See *Belknap*, 2014 IL 117094, ¶ 62. Consequently, the defendant has failed to demonstrate that he had meritorious issue to raise on direct appeal concerning the trial court's noncompliance with Rule 431(b) and, therefore, has failed to show ineffective assistance of appellate counsel regarding counsel's failure to raise that issue. See *People v. Bastida-Diaz*, 2021 IL App (1st) 191331-U, ¶ 43 (unpublished order under Supreme Court Rule 23) ("Because the evidence at trial was not closely balanced, there can be no plain error from the trial court's alleged

failure to comply with Rule 431(b). [Citation]. As there is no plain error, appellate counsel cannot be arguably ineffective for failing to raise the court's noncompliance with Rule 431(b) on appeal.").

¶ 33    In sum, because the first claim contested on appeal was forfeited and the second was without merit, we affirm the postconviction court's order dismissing the defendant's postconviction petition.

¶ 34    Affirmed.