2023 IL App (1st) 192462-U

No. 1-19-2462

Order filed January 12, 2023

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | No. 13 CR 21971 |
| v. | ) ) | |
| CORDARRYL STEVENSON, | ) ) | Honorable Jeffrey L. Warnick and Alfredo Maldonado, |
| Defendant-Appellant. | ) | Judges, presiding. |

JUSTICE MARTIN delivered the judgment of the court.
Justices Hoffman and Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court did not commit plain error in denying defendant's request to proceed *pro se*. Defendant's sentence was not excessive, and the court did not commit plain error by penalizing him for rejecting a plea agreement and proceeding to trial.

¶ 2    Following a jury trial, defendant Cordarryl Stevenson was found guilty of two counts of armed robbery with a firearm and two counts of aggravated vehicular hijacking with a firearm. The trial court imposed concurrent terms of 40 years' imprisonment on each armed robbery count, with the remaining counts merged. On appeal, Stevenson argues (1) the court committed plain error by denying his right to proceed *pro se*, (2) his sentence was excessive, and (3) the court

committed plain error by penalizing him for rejecting a plea agreement and proceeding to trial. We affirm.[1]

¶ 3                                    I. BACKGROUND

¶ 4        Stevenson, along with Dominic Cavallari, Mikaela Benit, Michael Sanders, and Rakeem Parker, was charged by indictment with two counts of armed robbery with a firearm, two counts of aggravated vehicular hijacking with a firearm, two counts of unlawful restraint, and one count of possession of a stolen vehicle. These charges arose from an incident on October 16, 2013, involving victims Alex Cuevas and Omar Lopez.

¶ 5        On December 4, 2013, the trial court appointed the office of the Public Defender to represent Stevenson.

¶ 6        On February 19, 2015, Stevenson requested to proceed *pro se*, citing conflicts with counsel. The court denied the request pending a pretrial investigation report (PTI).

¶ 7        On March 30, 2015, the court received Stevenson's PTI, which is included in the record on appeal and states, in relevant part, that Stevenson had a history of mental health issues. Counsel requested a behavioral clinical exam (BCX), which the court then ordered. Stevenson again requested to proceed *pro se*. The court explained that before conducting a hearing on the issue, it would review the BCX report and "make sure that you're fine."

¶ 8        On May 7, 2015, the court noted that the BCX report found Stevenson fit for trial, but also referred him for a full psychiatric summary.[2] Subsequently, counsel requested—and the court granted—a full psychiatric summary. Stevenson reiterated his request to proceed *pro se*, but the

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

[2]The BCX report is not included in the record on appeal.

court advised that it would review the psychiatric summary before ruling on the issue.

¶ 9      On June 11, 2015, the court received the psychiatric summary.[3] The court then admonished Stevenson regarding *pro se* representation and explained that Stevenson would be held to the same standard as an attorney. Additionally, the court explained the applicable sentencing ranges for the crimes Stevenson was charged with. Stevenson expressed that he understood. The court asked why Stevenson wished to proceed *pro se*, and Stevenson answered that his counsel withheld evidence from him and asked the State for a plea agreement "that I haven't asked for." Counsel responded that Stevenson had reviewed the evidence, but that there were certain materials she could not share. Further, she had conveyed the State's plea offer to Stevenson, who had rejected it. The court allowed Stevenson to proceed *pro se*.

¶ 10      On July 22, 2015, the court admonished Stevenson again regarding his *pro se* status and sentencing ranges. Stevenson repeated that he understood the charges and sentencing ranges.

¶ 11      On October 26, 2015, Stevenson requested counsel. The court acceded, stating, "you're going to have an attorney through the end of this matter." Stevenson agreed. When the court reassigned his prior public defender to his case, however, Stevenson asserted that he had proceeded *pro se* because "we had problems with each other before." The court informed Stevenson that he could accept counsel or proceed *pro se*; Stevenson elected to be represented.

¶ 12      On January 21, 2016, Stevenson reiterated his discontent with counsel and the court restated its position.

¶ 13      On March 14, 2016, and again on March 31, 2016, counsel advised the court that she was ready for trial, but that Stevenson had new cases pending. Counsel explained that she had reviewed

---

[3]The psychiatric summary is not included in the record on appeal and the trial court did not disclose its contents on the record.

Stevenson's file and determined that Stevenson had accessed discovery materials while proceeding *pro se*. Stevenson, however, asserted that he had communication issues with counsel and claimed she never related her defense strategy or reviewed discovery with him.

¶ 14    On August 30, 2016, defense counsel advised the court that Stevenson intended to reject a plea agreement that had been offered by the State. Counsel further explained that Stevenson no longer required a hearing on his motion to sever, because Stevenson was the "sole remaining" defendant. The State then related that, for the instant case only, it had offered Stevenson 16 years' imprisonment in exchange for a guilty plea to armed robbery without a firearm. The State expressed that it would request the maximum 45-year sentence should Stevenson be found guilty at trial of armed robbery with a firearm. The State also noted that it would file a motion to admit proof of other crimes, including Stevenson's pending cases, for use at trial and sentencing.

¶ 15    The court reviewed the State's offer with Stevenson, who claimed he was "threatened" by the State, who told him that "if I don't take 16 years, you're going to give me the maximum sentence." The court responded, "you're bright enough to know [the prosecutor] can't offer that." Stevenson stated that he wanted to proceed *pro se*. The court denied Stevenson's request, reminding him that he had agreed to be represented by counsel, and that it would consider "any further act" to be a delay tactic. Stevenson denied he was delaying and stated that counsel had informed him that she did not know what defense strategy to proceed with.

¶ 16    The court then informed Stevenson that he needed to make "a knowing and intelligent decision" to accept or reject the State's offer. Based on Stevenson's comments, the court "presume[d]" that Stevenson was rejecting the offer and understood "the consequences if [he] were found guilty." The court queried whether Stevenson understood the sentencing range he was facing, and Stevenson answered in the negative. The court stated it did not believe Stevenson's

denial and instead believed Stevenson was attempting to delay his trial. The court concluded that "based on this action at this point," Stevenson "has rejected the offer."

¶ 17    Counsel informed the court that she had (1) explained the sentencing ranges to Stevenson and previously wrote the range down for him to review, (2) expressed to Stevenson that the State would likely seek the maximum sentence should it prevail at trial, and (3) reviewed her theory of defense with Stevenson. However, counsel believed Stevenson was unhappy because she could not fulfill his requests to bar prior crimes evidence. According to counsel, during the "last several court dates," Stevenson "has not stated he wished to go *pro se*" or complained that "there was no defense."

¶ 18    The court remarked that the State and counsel had discharged their obligations to Stevenson, and it was "confident that he fully understands and appreciates" the offer and his potential sentencing range. The court further stated, over Stevenson's repeated protests that he wanted to proceed *pro se*, that it "heard your assurances up until the time now that you've heard the reality of the sentencing here [and] that you wish to be represented by *** counsel."

¶ 19    On December 6, 2016, with the case set for trial, defense counsel advised the court that she was making an oral motion to withdraw from the case because Stevenson had become volatile and threatened her. Counsel believed that Stevenson would "carry out" the threat if he were "given the opportunity." Counsel subsequently filed a written motion to withdraw.

¶ 20    On April 20, 2017, the court granted counsel's motion to withdraw, but held that the office of the Public Defender would continue to represent Stevenson. Subsequently, the case was transferred to a different courthouse and assigned to a different judge before whom Stevenson had other pending cases. Stevenson received a new public defender and made no further requests to proceed *pro se*.

¶ 21    On July 8, 2019, the State offered Stevenson 27 years' imprisonment in exchange for guilty pleas on his seven pending cases. Several days later, the State lowered its offer to 22 years, which Stevenson rejected. The court admonished Stevenson regarding the sentencing ranges, noting that the State's offer was significantly lower than what he would receive should he be found guilty and sentenced individually in each pending case. Stevenson expressed his understanding, rejected the offer, and opted to proceed to trial.

¶ 22    The trial commenced on July 23, 2019 on counts of armed robbery with a firearm and aggravated vehicular hijacking with a firearm. See 720 ILCS 5/18-2(a)(2), 18-4(a)(4) (West 2012). The following evidence was adduced at trial.

¶ 23    Omar Lopez testified he was staying with his friend Alex Cuevas in Skokie, Illinois on October 16, 2013. That afternoon, Lopez received a call from Dominic Cavallari, who wanted to purchase marijuana. They agreed to meet at a McDonald's Restaurant parking lot located at Dempster Avenue and Skokie Boulevard. Cuevas drove Lopez to the meeting in Lopez's Honda Accord automobile.[4] Cavallari called Lopez a second time before the meeting, but Lopez could not recall what they discussed. Cavallari also texted that his girlfriend, Mikaela Benit, would be with him and that they were walking down Gross Point Road.

¶ 24    Lopez and Cuevas picked up Cavallari and Benit, and Cavallari directed them to a parking lot across the street from a fire station. There, Benit brandished a firearm and announced her and Cavallari's intention to rob Lopez and Cuevas. Cavallari grabbed the firearm, cocked it, and pointed it approximately three inches from Cuevas and Lopez's heads; Lopez identified the firearm in court. Three or four people then emerged from behind nearby bushes; the group included

---

[4]As Lopez was in the process of moving at the time, the Accord contained all of Lopez's possessions.

Stevenson, whom Lopez identified in court.

¶ 25 Stevenson directed Cuevas to exit the vehicle and empty his pockets. Cuevas gave Stevenson his telephone and wallet. Another man, Michael Sanders, removed Lopez from the vehicle and ordered him to surrender his wallet and earrings. Cavallari grabbed Lopez's telephone from the passenger seat.[5] Sanders sat in the driver's seat of the Accord, Benit entered the passenger seat, and Stevenson entered the backseat. The vehicle drove away, and Cavallari fled on foot. Lopez and Cuevas ran to the nearby fire station and called the police.

¶ 26 On cross-examination, Lopez admitted that he originally explained to police that he had stopped his vehicle because his brakes were not working and conceded that he later repeated this story at the police station, but he denied lying to police at any other time. Lopez acknowledged providing police with a typewritten statement asserting that two people approached the vehicle; however, he testified at trial that three people emerged from the bushes in the parking lot. Only Cavallari had a firearm.

¶ 27 Andrew Rosenburg-Congleton testified that he was on misdemeanor probation and lived with his stepfather and Cavallari in October 2013. Around 1 p.m. on October 16, 2013, Rosenburg-Congleton was at home with Cavallari and Laurence McGowan. At some point, Rosenburg-Congleton, Cavallari, and McGowan walked to the Chicago Transit Authority (CTA) Yellow Line Skokie Swift station and met four people—Sanders, whom Rosenburg-Congleton knew as Poo, another man, a woman, and Stevenson, whom Rosenburg-Congleton identified in court.[6]

¶ 28 When they returned to Rosenburg-Congleton's home, Sanders proposed robbing Lopez,

---

[5]Lopez also had another telephone located in a bag inside the vehicle.

[6]During his testimony, Rosenburg-Congleton identified a photograph of Sanders as the person he knew as Poo. Rosenburg-Congleton initially testified that he "believe[d]" Sanders was at the house along with McGowan and Cavallari, but later testified that they met Sanders at the train.

who was an acquaintance of Rosenburg-Congleton, for marijuana. Stevenson then suggested stealing Lopez's vehicle and stripping it for parts. The woman stated that she should carry the firearm to avoid suspicion. Cavallari called Lopez twice, first to arrange the meeting, and again after Stevenson suggested stealing the vehicle. Everyone except Rosenburg-Congleton and McGowan then left. Rosenburg-Congleton never observed a firearm.

¶ 29    The group returned to Rosenburg-Congleton's house 15 to 30 minutes later. Cavallari, who was out of breath and sweaty, showed Rosenburg-Congleton a cell phone and a vehicle that Rosenburg-Congleton did not recognize. The others rummaged through the vehicle, while Stevenson again suggested taking the vehicle to the city to strip it.

¶ 30    The group, excluding Rosenburg-Congleton, Cavallari, and McGowan, left in the vehicle with Sanders driving. Cavallari "went off on his own." Rosenburg-Congleton did not call the police because he did not want to be involved, but he met with Skokie police detectives the next day.

¶ 31    On cross-examination, Rosenburg-Congleton testified that he did not know the names of most of the people involved in the incident, including Stevenson. Rosenburg-Congleton had known Sanders for a few weeks and knew that he carried a firearm. Rosenburg-Congleton testified that he gave police a typed statement on October 17, 2013. While he could have been jailed for using or being around drugs or firearms while on probation, he attested he did not fear giving the statement.

¶ 32    Defense counsel confronted Rosenburg-Congleton with the typed statement he made to police, in which he stated that "[Sanders] said to the rest of the group, [g]et in the car and we'll go through it when we get back to the city." On redirect examination, Rosenburg-Congleton testified that it was Stevenson who had suggested taking the vehicle and stripping it in the city, and that no

one had mentioned the vehicle before that.

¶ 33    Laurence McGowan testified that he was at Rosenburg-Congleton's home at 2 p.m. on October 16, 2013. He and Rosenburg-Congleton went to a CTA station to meet four people, including Stevenson, whom McGowan identified in court. McGowan did not know the names of the four individuals at that time. The group then returned to Rosenburg-Congleton's home and made plans with Cavallari to obtain marijuana. Soon after, everyone except McGowan and Rosenburg-Congleton left. When the group returned 20 minutes later, Cavallari showed McGowan a vehicle that McGowan did not recognize. The four people from the train, including Stevenson, "remov[ed] everything" from the vehicle. Afterwards, everyone except for McGowan, Rosenburg-Congleton, and Cavallari drove away in the vehicle. McGowan spoke with the Skokie police the next day. On cross-examination, McGowan testified that Cavallari and the others discussed obtaining marijuana.

¶ 34    Illinois state police trooper Timothy Tippet testified that he was in an unmarked vehicle patrolling the area where Interstate 90 and Interstate 94 intersect. Between 2:30 and 3 p.m. on October 16, 2013, Tippet heard a radio report regarding a stolen silver Honda Accord, which described the offenders as "four black persons, unknown on the sex," with at least one person armed. Approximately 10 to 30 minutes later, a silver Honda Accord with four occupants pulled in front of Tippet. He followed the vehicle for approximately three-quarters of a mile before a Chicago police vehicle maneuvered in front of the stolen Accord and activated its lights.

¶ 35    Once the vehicles stopped, Tippet approached the Accord on the driver's side and commanded the occupants to raise their hands and exit the vehicle. The occupants failed to comply. Stevenson, whom Tippet identified in court, was in the back passenger-side seat. Another officer removed Stevenson from the vehicle and handcuffed him. Tippet observed a different officer

recover a firearm from "[s]omewhere in the backseat."

¶ 36    The State published Tippet's dash camera video, which is included in the record on appeal and was reviewed by this court. The video depicts a sedan on a busy highway. A police vehicle, lights flashing, pulls in front of the sedan, forcing it to stop. Tippet stops behind the sedan, exits his vehicle, and approaches the rear driver's side of the sedan with his firearm drawn. He opens the rear passenger door and removes a person. A pink backpack falls from the vehicle. Other officers remove the remaining occupants, including Stevenson. Stevenson is searched by an officer, who takes an object from Stevenson's hoodie pocket.

¶ 37    On cross-examination, Tippet testified that he did not know from where in the backseat the firearm was retrieved; however, he wrote a report stating that a 9-millimeter firearm was recovered from a "bookbag" in the rear seat.

¶ 38    Skokie police commander Daniel O'Brien[7] testified that, on October 16, 2013 at just after 2 p.m., he was on duty with his partner, Detective Russell[8] when they responded to a call of an armed robbery and aggravated vehicular hijacking at the fire station on Gross Point Road. While there, they learned via radio that the stolen vehicle had been observed on the highway. O'Brien and Russell arrived at the traffic stop at approximately 2:50 p.m. They approached the rear passenger side of the stolen vehicle, and ordered Stevenson, whom O'Brien identified in court, out. After detaining Stevenson and Benit, who had been in the front passenger seat, O'Brien searched them. O'Brien discovered one phone in Stevenson's front sweatshirt pocket and another in his sweatshirt or pants pocket. O'Brien testified that a Chicago police officer recovered a loaded firearm from a pink backpack. O'Brien gave the firearm and backpack to evidence technician J.M.

---

[7]Commander O'Brien testified that he held the rank of sergeant on the date of the incident.
[8]Detective Russell's first name is not included in the report of proceedings.

Dewey, and the phones to Detective Senese.[9]

¶ 39    The State replayed Tippet's dash camera footage, and O'Brien identified himself searching Stevenson and recovering the first phone. He stated the video did not depict him recovering the second phone. According to O'Brien, the vehicle held four individuals—Stevenson, Sanders, Benit, and Parker. Cavallari was arrested later that day.

¶ 40    On cross-examination, O'Brien testified that Stevenson complied during his arrest, and that the firearm was never tested for DNA or fingerprints.

¶ 41    Lastly, Skokie police officer Alex Vincic testified. Vincic and his partner, Detective Moreno, interviewed Stevenson at the police station on October 16, 2013.[10] After being Mirandized, Stevenson informed Vincic that he, Benit, Sanders, and Parker took the train to Skokie and then walked to Cavallari's residence. Two other men were at the home. According to Stevenson, Cavallari proposed robbing "two Mexican boys." Cavallari contacted Lopez and arranged a meeting in a McDonald's Restaurant parking lot to purchase marijuana. Later, Lopez was called back so the group could change the meeting place to the parking lot of the CTA yellow line station.

¶ 42    Stevenson informed Vincic that he, Parker, Sanders, Benit, and Cavallari walked to the CTA parking lot to wait behind some bushes. Sanders gave a firearm to Benit, who placed it in her purse. When Lopez and Cuevas arrived, Cavallari and Benit approached and entered the back seat of Lopez's vehicle. A few minutes later, they all exited the vehicle and Cavallari pointed the firearm at Lopez and Cuevas. Sanders approached, followed by Stevenson and Parker. Cavallari

---

[9]Detective Senese's first name is not included in the report of proceedings.

[10]Officer Vincic testified that he held the rank of detective on the date of the incident. Detective Moreno's first name is not found in the report of proceedings.

gave the firearm to Sanders, and they patted down one of the victims, taking a wallet and cell phone. Stevenson patted down the other victim and took a wallet and cell phone. Cavallari fled, but Stevenson and the others entered the vehicle and returned to Cavallari's residence where they searched the vehicle. Stevenson explained to Vincic that the group made a deal to return the vehicle for more marijuana, but they ultimately drove away in the vehicle. On the highway, Sanders gave the firearm to Parker, who "tossed the gun back to Sanders." Afterwards, police stopped the vehicle. On cross-examination, Vincic testified that Stevenson's oral statement was not recorded.

¶ 43    The parties stipulated that, if called as a witness, evidence technician J.M. Dewey would testify that on October 16, 2013, a Skokie police detective presented him with a pink bag that was recovered from the stolen Accord. The bag contained a loaded firearm and Lopez's earrings. Dewey thereafter searched the Accord at the Skokie police station. He recovered Cuevas' phone and wallet, and a black backpack which contained Lopez's phone and several pieces of mail addressed to Sanders.

¶ 44    The jury found Stevenson guilty on all four counts. Stevenson filed a motion for new trial, which the trial court denied.

¶ 45    At the October 29, 2019 sentencing hearing, the trial court informed the parties that it had received Stevenson's presentence investigation report (PSI) and had reviewed it. The PSI reflected that Stevenson had pending cases for armed forcible detention, aggravated battery with a deadly weapon, aggravated unlawful restraint, criminal damage to government property, bringing a weapon into a penal institution, theft, aggravated battery of a peace officer, and disarming a peace officer. Stevenson had previous convictions for aggravated battery of a police officer (2017), possession of a stolen vehicle and residential burglary (2010), possession of cannabis (2009), robbery (2008), possession of a stolen vehicle (2007), retail theft (2007), and selling property on

the CTA (2007). He also had juvenile adjudications for possession of a stolen vehicle and criminal trespass to a vehicle.

¶ 46    Stevenson's PSI demonstrated that he was 24 years old on the date of the pertinent offense. He and his siblings were raised by their mother until her death when Stevenson was 11. Stevenson had a poor relationship with his father, who was a high-ranking gang member. Stevenson often ran away from home. Stevenson completed the eighth grade and later obtained his GED. Prior to incarceration, he worked for a tow truck company. Stevenson was previously a member of the Gangster Disciples. Stevenson reported that he began drinking regularly around age 19, and consumed marijuana and "embalming fluid" every day, which caused him to hallucinate. Stevenson took medication for high blood pressure and was in a residential treatment unit in jail. He was diagnosed with bipolar depression, post-traumatic stress disorder, anxiety, and impulse control disorder, and was prescribed psychotropic medications.

¶ 47    The defense submitted a mitigation report, and the trial court informed the parties that it had received and reviewed it. The mitigation report concluded that Stevenson's upbringing likely caused him to view the world as "ungiving and threatening." Stevenson's father regularly abused him and Stevenson's mother. After his mother's death, Stevenson and his siblings were separated and lived with relatives. Stevenson was admitted to psychiatric care in May 2000, five months after his mother's death. He was again admitted to psychiatric care in November and December 2001 for suicidal, violent, and aggressive behavior. Stevenson was repeatedly arrested between 2006 and 2011, had a "verbal IQ of 72," and sustained "traumas to his head" that could predispose him to "violent and aggressive responses in the face of distress." The report found that Stevenson's behavior was a form of self-preservation, and although he "would appear as someone beyond reform," he had exhibited reduced symptomology "in the presence of mental health professionals."

¶ 48    In aggravation, the State called Des Plaines police officer Adam Sweeney, who testified that he worked in the Cook County Department of Corrections on July 28, 2016. That afternoon, Stevenson and another inmate made a "ruckus" in a day room, removed cameras, and threatened other inmates. Negotiators were called, and Stevenson demanded to speak with his brother.

¶ 49    The State published footage of the incident, comprising several clips from different cameras, which is included in the record on appeal and has been viewed by this court.

¶ 50    The video depicts a jail dayroom viewed through an office window. Stevenson, whom Sweeney identified in court, paces and yells. Stevenson, holding a knife, walks to the window and requests to see his brother. In a subsequent clip, Stevenson and another inmate stand on tables holding garbage cans, while other inmates gather in the back of the room. Next, all the inmates sit at the front of the room, except for Stevenson and another inmate, who stand behind them. Some of the inmates point offscreen and laugh, and someone states that a person is bleeding.

¶ 51    In a later clip, Stevenson holds an inmate against the window and threatens him with the knife. An officer speaks to Stevenson, who releases the inmate. Next, two inmates start fighting; Stevenson drags one of the two inmates away using clothing wrapped around the man's neck. The man is eventually released from the dayroom. Officers request to see an injured inmate, stating that someone was stabbed. Next, a loud banging sound is audible as officers in protective gear detain the inmates and medics bandage a man's leg. Blood is visible on the floor.

¶ 52    The State next detailed Stevenson's criminal history and pending cases, and the court noted it could take judicial notice of the accusations underlying the pending cases. The State addressed the video, noting it showed approximately 20 minutes of a four-to-five-hour standoff. The State concluded that Stevenson did not deserve the minimum sentence of 21 years' imprisonment. Instead, a "substantial sentence" was warranted, given Stevenson's criminal history and his

subsequent conduct while in custody.

¶ 53    In mitigation, defense counsel asserted that the video only depicted "bits and pieces" of the incident, which resembled "more of a staged event" than a hostage situation. Counsel discussed the PSI and mitigation report and stated that Stevenson was "born without a chance." Stevenson's childhood was filled with violence and fear, he displayed signs of recent self-harm, and he could not control the symptoms of his mental health conditions.

¶ 54    In allocution, Stevenson stated that his "mental illness" was not an attempt to "play the system," but rather, had been "ongoing" since childhood. He explained that nothing was done to help prevent him from self-harming or "lashing out" in jail. He concluded that he was "not perfect" and "no saint," but "could have made better decisions" throughout his life.

¶ 55    The court merged count III into count I and count IV into count II, and sentenced Stevenson to concurrent terms of 40 years' imprisonment for armed robbery. The sentences would be consecutive to the 15-year term Stevenson was currently serving for aggravated battery.

¶ 56    In imposing sentence, the court noted that Stevenson's case had been before it "for a few years," allowing the court to consider Stevenson's character, attitude, and history. The court found the mitigation report "pretty compelling" and characterized Stevenson's upbringing as "tragic," "horrific," "heart wrenching," and "certainly something that gives this court pause." Although the court was "moved" by Stevenson's "insight into his situation," it noted that Stevenson was "here not for being that small child but for being in his 20s when he committed the offense of armed robbery." The court found the applicable statutory aggravating factors included Stevenson's criminal history and the need "to deter others from committing the same crime." The court cited Stevenson's behavioral issues—even in a high-security setting—and noted that, while the hostage situation was not initially violent, it escalated. The court determined that Stevenson "unfortunately

is someone who is very violent and very dangerous." The court concluded that the aggravating factors "outweigh[ed]" the mitigation and Stevenson's sentence needed to consider "the safety of the community."

¶ 57 Counsel filed a motion to reconsider sentence, which was denied. Stevenson timely filed a notice of appeal.

¶ 58                                    II. ANALYSIS

¶ 59                          A. Request to Proceed *Pro se*

¶ 60 On appeal, Stevenson first argues that the trial court erroneously denied his second request to proceed *pro se*, which was consistent, unequivocal, and clearly expressed his concern with counsel's representation. Stevenson failed to preserve this issue for appeal, but requests review under the plain error doctrine.

¶ 61 If a defendant fails to object to an error at trial and fails to raise the error in a posttrial motion, he forfeits the issue on appeal. *People v. Belknap*, 2014 IL 117094, ¶ 47. Forfeited errors may be reviewable under the plain error doctrine when (1) the evidence was closely balanced such that "the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) the error was "so serious that it affected the fairness of the trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Id*. ¶ 48. The first step of plain error review is to determine whether any error occurred. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010).

¶ 62 The sixth amendment grants defendants the right to represent themselves in criminal proceedings. *People v. Hunt*, 2016 IL App (1st) 132979, ¶ 16 (citing *Faretta v. California*, 422 U.S. 806, 833-36 (1975)). To invoke this right, the defendant must knowingly and intelligently relinquish his right to representation. *Id.* (citing *People v. Baez*, 241 Ill. 2d 44, 115-16 (2011)).

The request must be clear and unequivocal. *Id.* To determine whether a request was clear and unequivocal, a reviewing court must consider "the overall context of the proceedings, including the defendant's conduct following his request to represent himself." *Id.* (citing *People v. Mayo*, 198 Ill. 2d 530, 538-39 (2002)). Courts must make every reasonable presumption against the waiver of the right to counsel. *Mayo*, 198 Ill. 2d at 538 (citing *People v. Burton*, 184 Ill. 2d 1, 23 (1998)).

¶ 63 The right to self-representation is not absolute and may be forfeited if a defendant "engages in serious and obstructionist misconduct" or "cannot make a knowing and intelligent waiver of counsel." *People v. Rohlfs*, 368 Ill. App. 3d 540, 545 (2006) (citing *People v. Ward*, 208 Ill. App. 3d. 1073 (1991)). This court has outlined three grounds for denying a defendant's request to proceed *pro se*: (1) the request is so late in proceedings that it would be disruptive, (2) the defendant engages in serious and obstructionist misconduct, or (3) the defendant cannot knowingly and intelligently waive his right to counsel. *People v. Woodson*, 2011 IL App (4th) 100223, ¶ 24 (citing *Ward*, 208 Ill. App. 3d. at 1084). A defendant may waive their right to self-representation if their conduct indicates that they are vacillating or have abandoned their request. *People v. Meeks*, 249 Ill. App 3d 152, 169-70 (1993) (citing *McKaskle v. Wiggins*, 465 U.S. 168, 182-83 (1984)). Moreover, a defendant "does not have an evergreen right to change his election back and forth, no matter how 'clearly' he conveys each successive choice to the court." *People v. Rainey*, 2019 IL App (1st) 160187, ¶ 49.

¶ 64 The trial court's decision on a defendant's request to represent themselves will be reversed only if the court abuses its discretion. *Hunt*, 2016 IL App (1st) 132979, ¶ 16. "An abuse of discretion occurs where the court's ruling is arbitrary and without a logical basis." *Id.*

¶ 65 Stevenson originally requested to proceed *pro se* on February 19, 2015. The court ordered

a BCX and, later, a psychiatric summary. On June 11, 2015, after receiving the report and summary, the court admonished Stevenson and allowed him to proceed *pro se*. On October 26, 2015, Stevenson requested counsel. The court granted the request, explaining that Stevenson would "have an attorney through the end of this matter." Stevenson initially agreed but objected after the court reappointed his prior attorney. The court explained to Stevenson that he could accept counsel or proceed *pro se*; Stevenson elected to accept counsel. On March 14 and March 31, 2016, counsel advised the court that she was ready for trial, but Stevenson alleged that counsel never related her defense strategy or reviewed discovery with him.

¶ 66     On August 30, 2016, both the prosecutor and the court explained the terms of a proposed plea agreement to Stevenson. Stevenson did not respond to the offer but claimed that the State threatened that the court would impose a "maximum sentence" if he declined to accept the State's plea offer. Stevenson again requested to proceed *pro se* and complained about counsel's performance. The court denied his request, reminding Stevenson that he had agreed to be represented by counsel, and that it would consider "any further act" to be a delay tactic. Stevenson then asserted that he did not understand the applicable sentencing range, and the court concluded that his conduct was dilatory. Counsel remarked that she had advised Stevenson regarding the sentencing ranges, reviewed her strategy with him, and believed that he was unhappy because she could not bar the admission of certain evidence. Counsel further noted that Stevenson had neither complained about her representation during recent court dates nor requested to proceed *pro se*. The court rejected Stevenson's request to proceed *pro se*, concluding that he understood the sentencing range and had provided "assurances" that he would continue to be represented by counsel.

¶ 67     Viewing the record in its entirety, we find the court did not abuse its discretion when it refused to allow Stevenson to proceed *pro se* a second time. As noted, after Stevenson rescinded

his initial request to proceed *pro se* on October 26, 2015, he agreed to be represented by counsel for the duration of the proceedings. Stevenson next requested to proceed *pro se* on August 30, 2016, immediately after the State and the trial court advised him regarding a plea offer. Rather than respond to the offer, Stevenson claimed that the State had threatened him, that he did not understand the sentencing range, and that he wanted to proceed *pro se*. The timing of Stevenson's request, made during a hearing on a plea offer following more than 2½ years of litigation, supports the conclusion that the request was dilatory. Moreover, the court had admonished Stevenson throughout the proceedings regarding the sentencing range, and defense counsel noted that she had also discussed the sentencing range with Stevenson. Counsel further noted that Stevenson had not recently complained about her performance or expressed a desire to proceed *pro se*. The court, therefore, could reasonably reject both the notion that Stevenson's request was related to counsel's performance and that Stevenson failed to understand the sentencing range. It was also reasonable for the court to conclude that Stevenson was, instead, obstructionist. *Woodson*, 2011 IL App (4th) 100223, ¶ 24. Under these circumstances, we cannot say the trial court abused its discretion in rejecting Stevenson's second request to proceed *pro se*. Because there was no error, Stevenson's request for plain error review fails. See *Thompson*, 238 Ill. 2d at 613.

¶ 68                                B. Excessive Sentence

¶ 69    Stevenson next argues that his sentence was excessive given the facts of the case and the mitigating evidence he presented. Specifically, Stevenson notes that he was not in possession of a firearm during the offense, he experienced a troubled childhood and suffered from mental illness, and his sentence exceeded the term offered by the State in a proposed plea agreement.

¶ 70    At sentencing, the trial court must balance "the seriousness of the offense" and "the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. The trial

court has broad discretion when imposing a sentence, and its decisions are entitled to great deference. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). The trial court is best positioned to evaluate the appropriate sentence because it personally observed the defendant and the proceedings. *People v. Jones*, 2019 IL App (1st) 170478, ¶ 50. As the trial judge "has the opportunity to weigh such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age," the reviewing court "must not substitute its judgment for that of the trial court merely because it would have weighed these factors differently." (Internal quotation marks omitted). *Alexander*, 239 Ill. 2d at 212-13.

¶ 71    If a sentence is within the statutory limits, this court will not disturb it absent an abuse of discretion. *People v. Burton*, 2015 IL App (1st) 131600, ¶¶ 35-36. An abuse of discretion occurs when a sentence is "manifestly disproportionate to the nature of the offense." *People v. Jackson*, 375 Ill. App. 3d 796, 800 (2007). The presence of mitigating factors or an absence of aggravating factors does not mean that the minimum sentence must be imposed. *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002). Rather, the most important factor is the seriousness of the crime. *Id*.

¶ 72    Generally, armed robbery is a Class X felony with a sentencing range of 6 to 30 years in prison. 720 ILCS 5/18-2(b) (West 2012); 730 ILCS 5/5-4.5-25(a) (West 2012). A 15-year enhancement applies when the defendant carries or was otherwise armed with a firearm. 720 ILCS 5/18-2(b) (West 2012); *People v. Rodriguez*, 229 Ill. 2d 285, 293-94 (2008) (defendant accomplice is accountable and may be subject to a firearm enhancement when principal is armed). Thus, the applicable sentencing range in this case was 21 to 45 years. Stevenson received 40 years' imprisonment, which falls within the statutory guidelines and is presumed to be proper unless Stevenson affirmatively shows otherwise. *Burton*, 2015 IL App (1st) 131600, ¶ 36. He has failed to do so.

¶ 73    The evidence at trial established that Stevenson, Sanders, Parker, and Benit met with Cavallari and developed a plan to rob Cuevas and Lopez. Stevenson proposed they also steal Lopez's vehicle and strip it for parts. Cavallari then contacted Lopez and arranged a meeting. Later, Cavallari and Benit entered Lopez's vehicle and directed the driver, Cuevas, to a parking lot. There, Benit and Cavallari brandished a firearm while Stevenson and the others emerged from nearby bushes. Stevenson ordered Cuevas to exit the vehicle and took his phone and wallet. Sanders took a wallet and earrings from Lopez, Cavallari took one of Lopez's phones, and Stevenson and other offenders left in Lopez's vehicle. At Cavallari's residence, Stevenson again proposed stripping the vehicle, and he was in the vehicle when officers stopped it on the highway.

¶ 74    At sentencing, the trial court acknowledged Stevenson's difficult childhood and history of mental illness, as detailed in the PSI and mitigation report, which the court considered "pretty compelling." The court was also "moved" by Stevenson's allocution describing his struggles with mental illness and self-harm. In aggravation, however, the court noted that Stevenson had an extensive criminal history and that his sentence must serve the purposes of deterrence and protecting the community. Stevenson's standoff in pretrial detention, moreover, suggested that he was "very violent and very dangerous."

¶ 75    Based on the record, the trial court was apprised of the mitigating factors Stevenson raises here, explicitly considered many of them, and concluded that the seriousness of the offense still required a significant sentence. See *Quintana*, 332 Ill. App. 3d at 109. This was not an abuse of discretion given Stevenson's (1) lengthy criminal history, (2) role in planning and executing the armed robbery, and (3) conduct during pretrial detention, when he brandished a knife during a lengthy standoff with correction officers. Moreover, although Stevenson's history of mental health problems and substance abuse was before the court, "evidence of a defendant's mental or

psychological impairments may not be inherently mitigating, or may not be mitigating enough to overcome the evidence in aggravation." *People v. Thompson*, 222 Ill. 2d 1, 42-43 (2006); see also *People v. Madej*, 177 Ill. 2d 116, 139 (1997) (trial court was not required "to view the purported negative effects of defendant's chronic abuse of drugs and alcohol as a mitigating factor"). As the trial court observed, it had ample opportunity to evaluate Stevenson's character, attitude, and history. Viewing the record as a whole, we cannot say the court abused its discretion in fashioning Stevenson's sentence. See *Jackson*, 375 Ill. App. 3d at 800.

¶ 76                                                 C. Right to Trial

¶ 77     Stevenson further argues that the court penalized him for exercising his right to trial. Stevenson failed to raise this issue at his sentencing hearing or in his postsentencing motion but raises it in his reply brief for the first time and asks that we review it under the plain error doctrine. See *People v. Ramsey*, 239 Ill. 2d 342, 412 (2010) (request for plain error review, first raised in reply brief, "is sufficient to allow us to review the issue for plain error"). As aforementioned, the first inquiry when reviewing an issue for plain error is to determine whether any error transpired. *Thompson*, 238 Ill. 2d at 613.

¶ 78     A trial court may not penalize a defendant for exercising their right to trial. *People v. Ward*, 113 Ill. 2d 516, 526 (1986). Even if a defendant receives a sentence greater than one offered in a plea agreement, that fact alone does not support the inference that the defendant received a harsher sentence for proceeding to trial. *People v. Carroll*, 260 Ill. App. 3d 319, 348-49 (1992). Instead, the record must clearly indicate that the harsher sentence resulted from the trial demand. *Ward*, 113 Ill. 2d at 526. This may occur where the trial court makes explicit remarks regarding a harsher sentence, or where the actual sentence is outrageously higher than the one offered during plea negotiations. *People v. Beard-Jones*, 2019 IL App (1st) 162005, ¶ 26. The reviewing court must

consider the entire record and not merely a select few statements of the trial court. *Ward*, 113 Ill. 2d at 526-27.

¶ 79    In this case, the State made several plea offers during the approximate 5½ years of pretrial litigation. On August 30, 2016, the State advised the court that it had offered 16 years' imprisonment to Stevenson in exchange for a guilty plea to armed robbery *without* a firearm enhancement. However, the State noted that it would seek the maximum 45-year term were Stevenson found guilty of armed robbery *with* a firearm. Stevenson declined the offer. Then, in July 2019, before a different judge, the State offered Stevenson 27 years' imprisonment to resolve all his pending cases. Stevenson rejected that offer and again declined when the State reduced the offer to 22 years' imprisonment. Ultimately, Stevenson was found guilty of aggravated vehicle hijacking with a firearm and armed robbery with a firearm and sentenced to 40 years' imprisonment for the latter offense.

¶ 80    Viewing the record in its entirety, Stevenson has failed to establish that the trial court penalized him for exercising his right to trial. As an initial matter, it was the State, and not the trial court, that proposed the various pretrial plea agreements that Stevenson rejected. Stevenson's claim that the trial court abused its discretion by imposing a higher sentence is not based on any of the trial court's comments but is instead based on the premise that the sentence was harsher than the State's various plea offers. See *People v. Walker*, 2021 IL App (4th) 190073, ¶ 68 ("The disparity between the State's plea offer and defendant's sentence does not presuppose a punishment for availing himself of his right to a trial."); see also *People v. Andrews*, 2013 IL App (1st) 121623, ¶ 19 ("the mere fact that the defendant is given a greater sentence than was *** offered in a plea deal, does not support an inference that the sentence was imposed as a punishment for demanding trial").

¶ 81    Indeed, when the State offered the various plea agreements, the court had not yet been advised of all the circumstances of the offenses that were adduced at trial or of all the aggravating evidence that was ultimately introduced at sentencing. At the sentencing hearing, the court explained its sentencing rationale in detail and made no statement suggesting that Stevenson's sentence penalized him for not pleading guilty. *Beard-Jones*, 2019 IL App (1st) 162005, ¶ 26. The fact that Stevenson's 40-year sentence exceeded the State's offers is not indicative of punishment. As no error occurred, Stevenson's request for plain error review is meritless.

¶ 82                            D. Unconstitutional Sentence

¶ 83    Stevenson last argues that his 40-year sentence is unconstitutionally disproportionate to the sentences received by two of his co-defendants, Cavallari and Benet. This claim is, however, forfeited. Prior to trial, on August 30, 2016, defense counsel advised the court that Stevenson was the "sole remaining" defendant in the case. Therefore, Stevenson could have addressed the outcomes of the co-defendants' proceedings during his sentencing hearing. Stevenson failed to do so and does not request plain-error review. Therefore, we decline to address the issue for the first time on appeal. *Belknap*, 2014 IL 117094, ¶ 47

¶ 84                            III. CONCLUSION

¶ 85    For the aforementioned reasons, we affirm the judgment of the circuit court.

¶ 86    Affirmed.